## TITLE GUARANTY & SURETY CO. v. WITMIRE.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1912.)

### No. 2,195.

**1. CONTRACTS (§ 144*)—CONSTRUCTION—WHAT LAW GOVERNS.**

A contract to be performed in Minnesota, and concerning property to be transferred there, is governed by the laws of that state, though made in Illinois.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 724–727; Dec. Dig. § 144.*]

**2. CHATTEL MORTGAGES (§ 5*)—INSTRUMENTS CONSTITUTING.**

Ditch contractors' agreement with their surety to indemnify the latter against loss, and reciting that the contractors agreed that, on their being unable to complete the contract, they would assign and did assign to the surety such plant as they might have on the work, was in effect a chattel mortgage of the plant.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 4–13, 16; Dec. Dig. § 5.*]

**3. CHATTEL MORTGAGES (§ 18*)—AFTER-ACQUIRED PROPERTY.**

The chattel mortgage being a Minnesota contract, after-acquired property at the time of purchase by the contractors became subject to the mortgage.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 61–66; Dec. Dig. § 18.*]

**4. BANKRUPTCY (§ 188*)—CHATTEL MORTGAGES—RIGHTS OF TRUSTEE.**

Where ditch contractors' surety became vested with title to the contractors' plant before their bankruptcy under chattel mortgage agreement, and on account of the contractors' abandonment of their work, they became entitled to the property as against the contractors' trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Action by Frederick J. Witmire against the Title Guaranty & Surety Company. From a judgment for plaintiff, defendant brings error. Reversed and remanded.

The trustee in bankruptcy, Witmire, sued to recover the value of certain property alleged to belong to the bankrupt's estate and to have been .converted by the plaintiff in error (the defendant below) to its use. At the conclusion of the evidence, such defendant's motion for a directed verdict was overruled, and the jury was instructed to return a verdict for the trustee on his motion for such damages as it might find him entitled to recover under the charge given. Judgment having been rendered on the verdict for $2,800, error is prosecuted to secure a review of the proceedings had in the Circuit Court.

The facts disclosed by the record are as follows: Early in 1909, Stone and Green (hereinafter called the contractors) entered into a contract for the construction of a ditch in Polk county, Minn. On March 20, 1909, the contractors applied to the Title Guaranty & Surety Company (hereinafter called the Surety Company), at Chicago, Ill., for a bond conditioned for the faithful performance of their work, and entered into an agreement with it, which was signed by them only, to pay in advance a premium of $24.07 for each year during the continuance of such bond, and to indemnify the Surety Company against all loss, costs, damage, charges, and expenses, of whatever kind, resulting from any acts, default, or neglect of theirs that the Surety Company might sustain or incur by reason of its execution of such bond or any continuation thereof. The agreement further recites: "The undersigned does (do) further agree, in the event of its (their) being unable to complete or carry on the aforementioned contract, to assign, and does (do) hereby assign, such plant as the undersigned may own or have on said work, to the said the Title Guaranty & Surety Company." Other provisions of the agreement are that the contractors would accept, as conclusive against them, the vouchers or other evidence of any loss paid by the Surety Company under its obligation and also of all costs and expenses incurred by the Surety Company in adjusting such loss or in completing the contract for ditching, and that, in the event they defaulted in or breached any of the provisions of the ditching contract, the Surety Company, as surety upon the bond, should be subrogated to all their rights and properties as principal in such contract, and that deferred payments and any and all moneys and properties that might be due and payable to them at the time of such default, or that might thereafter become due and payable to them on account of such contract, should be credited upon any claim made upon the Surety Company under the bond.

Thereupon the Surety Company became their surety on the last-named date on a $5,000 bond given to Polk county for the faithful performance of their contract for ditching. The agreement was not filed for record because the Surety Company was not accustomed so to file instruments of that character; but it was not withheld from record in pursuance of any agreement between the parties, or to strengthen the credit of the contractors, or to hinder, delay, or defraud their creditors. On May 11th the contractors purchased a land dredge or steam shovel, at Marion, Ohio, for $3,040, which was forwarded about June 10th to the scene of their future work in Minnesota, and, on its arrival, it was installed and used by them in the digging of the ditch. On September 4th the contractors abandoned the completion of their contract. At that time they had on the line of their work the steam shovel, a camping outfit, a water tank, oil lamps, and other tools. On September 10th they filed a petition in bankruptcy in the District Court for the Eastern District of Michigan, and five days later the Surety Company took possession of their property theretofore used by them in their Minnesota work, and completed their contract, at a loss of $2,500. This loss was subsequently reduced to $1,500 by the Surety Company's sale of such property for $1,000, which was the best price obtainable therefor. A trustee in bankruptcy having been elected, he sued to recover the value of the property so sold, with the result heretofore mentioned.

L. W. Goodenough, for plaintiff in error.

H. V. Barbour and E. A. McDonald (Bowen, Douglas, Eaman & Barbour, on the brief), for defendant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

PER CURIAM. [1] The agreement between the contractors (Green and Stone) and the Surety Company was made in Illinois, but it concerned property to be located in, and which was in fact transferred to, Minnesota. The contractors' plant was used there, and remained in their possession in that state until it was taken over by the Surety Company. The parties intended that their agreement should be carried out where the ditch was to be digged. It must, therefore, be interpreted with reference to the law of Minnesota. Union Trust Co. v. Bulkeley, 150 Fed. 510, 80 C. C. A. 328; Re Green (D. C.) 134 Fed. 137.

Both parties rightly concede, and it was rightly held by the learned trial judge, that under the law of Minnesota a chattel mortgage vests the legal title to the mortgaged property in the mortgagee. Kellogg v. Olson, 34 Minn. 103, 24 N. W. 364; Fletcher v. Neudeck, 30 Minn. 125, 14 N. W. 513. Nor is it controverted that, under the law of that state, a mere general creditor who has not seized the mortgaged property by legal process, or acquired some lien upon it, cannot question the validity of a chattel mortgage which has not been filed as provided by sections 3461 and 3462, Rev. L. Minn. 1905. Only a subsequent purchaser who acquired the mortgaged property while the mortgage was unfiled, or a creditor who laid hold of the property by legal process during such time, can avoid the mortgage for the simple reason that it was not filed. Clark v. Richards Lumber Co., 68 Minn. 282, 288, 71 N. W. 389; Ellingboe v. Brakken, 36 Minn. 156, 30 N. W. 659; Tolbert v. Horton, 31 Minn. 518, 18 N. W. 647; Howe v. Cochran, 47 Minn. 403, 50 N. W. 368.

The court below adopted the view that the indemnity agreement created a mere equitable charge or lien in favor of the Surety Company, to be thereafter consummated by voluntary delivery of possession or by compulsory action under a bill for specific performance, and that it cannot be classified as a chattel mortgage. It was of the opinion that, although a chattel mortgage under the Minnesota rule operates to convey a legal interest in the title to after-acquired property, the rule must rest on the theory that the mortgage affects an existing body of property to which the after-acquired property is merely incidental; and that, as there was in this case no existing body to which the subsequently purchased property could be incidental, no interest in the legal title to the property so purchased was acquired by the Surety Company under its agreement. If these conclusions are correct, an affirmance must follow. If they are unsound, there must be a reversal.

[2] The controlling questions, then, presented by the record for decision are: (1) Was the agreement between the contractors and the Surety Company in substance and effect a chattel mortgage? (2) If

it was such, did the after-acquired property at the time of its purchase by the contractors become subject to and pass under the mortgage?

The purpose of the agreement was not merely to obligate the contractors to the payment of the premium for the bond for the first year and annually thereafter in case of its continuation, but also fully to indemnify the Surety Company against all loss, costs, damage, charges, and expenses resulting from any acts, default, or neglect of the contractors. The parties recognized that an enforceable liability might arise against the Surety Company through a possible inability on the part of the contractors to complete their work. To effectuate, in as ample a manner as possible, their intent that the Surety Company should not sustain any loss whatever on account of its suretyship, they stipulated that, in the event of the contractors defaulting in or breaching any of the provisions of the contract with Polk county, the Surety Company might step into their shoes, and should be subrogated in every respect and to the fullest extent to all their rights and privileges under such contract, and should in the final adjustment account to them. The contractors not only agreed, in the event of their inability to complete or carry on their ditching contract, to assign, but they also actually made a present assignment to the Surety Company, at the time of the execution of the agreement, of the entire plant which they might own or have on the work to be performed by them. The consideration for the loan of the bonding company's credit was not only the payment of the annual premiums on the bond and the right to exhaust, if necessary for its protection, all the funds which were due or might become due under the Polk County contract, but also the additional security afforded by the contractors' plant, of the use of which it might avail itself in completing the contract, if the occasion for its so doing arose, and the value of which it might, if need be, apply towards reimbursing itself for any loss sustained and still hold the contractors liable for any residue of loss remaining. If, after being fully reimbursed, it should have in its possession any property of whatever kind belonging to the contractors, it would then be required to return the same to them, but, if they fully performed, its rights under the agreement would terminate by operation of law. The transaction was an honest and a lawful one, and a liberal construction should be given to it in aid of the obvious intention of the parties. The agreement is not clothed in the technical language or cast into the ordinary form of a chattel mortgage, but the assignment of personal property as security for a debt is usually regarded as constituting a mortgage of the property. 6 Cyc. 990. In the absence of a statute prescribing a particular form for chattel mortgages, the assignment by the contractors of their plant to the Surety Company, reserving the surplus, if any, to themselves, is in effect a chattel mortgage. Dunham v. Whitehead, 21 N. Y. 131; Lumbert v. Woodard, 144 Ind. 335, 43 N. E. 302, 55 Am. St. Rep. 175. The instrument embodying the agreement of the parties meets the requirements of the definition of a chattel mortgage given in Merrill v. Ressler, 37 Minn. 82, 85, 33 N. W. 117, 5 Am. St. Rep. 822, and must be held to be such, which definition is as follows:

"A chattel mortgage is a transfer of the title as security, and strictly, at law, must contain words of conveyance. But so strongly are courts inclined to so construe the agreements of the parties as to make them effectual that no formal words of transfer, and no particular form of instrument, are required to make an agreement operate as a mortgage. Even though terms are used which would imply something else, yet, if it is apparent that a mortgage was intended, the court will so construe it."

Outside of the opinion filed by the trial judge, the record is silent as to whether the contractors at the time of the execution of the indemnity agreement owned or not any part of the plant of which the Surety Company took possession. The case of Wood v. United States Fidelity & Guaranty Co. (D. C.) 143 Fed. 424, 427, involved a contract similar to the one under consideration. There was no showing of when the defendant took possession of the property mentioned in the agreement, but it was held that, if all the property therein named was acquired after its execution, the defendant's claim to it, when it was taken into possession, was nevertheless valid. For the purpose of this case, the Minnesota court has spoken much more to the point in Ludlum v. Rothschild. 41 Minn. 218, 43 N. W. 137. The question as to the validity and effect of a mortgage of future property not in esse, or not owned by the mortgagor at the time, was under consideration. After stating the rule at common law and in equity, and the doctrine of "potential existence," and of an executory agreement for a mortgage, the court took the advanced ground of adopting for all cases the rule in equity that:

"Excepting in cases prohibited by statute (Laws 1887, c. 176), whenever the parties by their contract in clear terms express an intention to create a positive lien upon personal property, not then owned but to be subsequently acquired by the mortgagor, whether then in esse or not, the mortgage attaches as a lien on the property as soon as the mortgagor acquires it, as against the mortgagor, and all claiming under him, either by voluntary transfer or with notice, precisely as if the property had been in being and belonged to the mortgagor when the mortgage was executed."

The announcement in the Ludlum Case was interpreted in Hogan v. Atlantic Elevator Co., 66 Minn. 347, 69 N. W. 1, which involved a mortgage given by the mortgagor on crops thereafter to be grown. The point was made that there was no evidence at the time the mortgage was executed that the mortgagor was in possession of or had any interest in the land on which the grain was raised, and that consequently the grain had not even a potential existence and was incapable of being the subject of a mortgage. In answer to that argument the court said:

"This is fully disposed of by the case of Ludlum v. Rothschild. 41 Minn. 218, 43 N. W. 137, in which this court went entirely beyond the doctrine of potential existence and adopted the rule in equity, holding that where parties, by their contract, in clear terms express an intention to create a mortgage lien upon personal property, not then owned, but to be subsequently acquired by the mortgagor, whether then in being or not, the mortgage attaches as a lien on the property as soon as the mortgagor acquires it."

[3] The indemnity agreement being in substance and effect a chattel mortgage, it follows that under the Minnesota decisions, which do not limit the operation of an instrument of that character on sub-

sequently acquired property to such as is merely incidental to an existing body of property, the assignment of the after-acquired property by the contractors became effective as soon as it was purchased, and the title thereto at that time, which was prior to the institution of the bankruptcy proceedings, vested in the Surety Company, with the right on its part to take possession whenever a default occurred.

The conclusion reached as to the rights of the parties find support in Hurley v. Atchison, T. & S. F. R. Co., 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729. The coal company had agreed to furnish the defendant in that case a constant supply of coal at a stated price for the operation of a part of its road, payment for which was to be made on the 15th day of each month for all coal shipped during the preceding calendar month. If the coal company failed to perform, the defendant, as a party to the tripartite agreement by which the coal company acquired the right to mine the coal, had a right to re-enter and avoid the lease. The coal company becoming financially embarrassed, the defendant, to insure a coal supply for its daily consumption, consented to a modification of the agreement whereby it advanced funds to meet the coal company's pay rolls and to continue the operation of the mines, with the understanding that repayment should be made by the subsequent delivery of coal. The coal company having been adjudicated a bankrupt, the receivers and subsequently the trustees in bankruptcy with the court's sanction continued to operate the mines and deliver coal as required by the contract, but refused to recognize the advances made as payment for the coal delivered. The transaction was not one of ordinary borrowing and lending of credit or security, but, from an equitable standpoint, to the extent of the advancements was deemed to be a pledge of a sufficient quantity of unmined coal set apart as a security for the repayment of the defendant and to create an equitable charge or lien, however inartificially it may have been expressed. The equitable rights of the parties were not changed, it was said, by the commencement of bankruptcy proceedings, nor were their legal and equitable obligations disturbed. The advances made by the defendant to the coal company were enforced as a preferential claim against the assets of the bankrupt's estate in the hands of the trustees for such a quantity of coal when mined as the advances made would pay for at the price agreed upon in the original contract. The coal company was at liberty under the modified agreement to mine coal on the same terms and conditions as before and was obligated to supply the defendant with fuel as before, and the unmined coal stood as the defendant's protection for its advancements. In the present case, the contractors not only had the right to complete their contract to dig the ditch, but for the Surety Company's protection were bound to do so without loss to it. The coal company pledged its unmined coal for the advancements made to it, which were in the nature of loans, with the right on the part of the defendant to repossess itself of the property leased in case of the coal company's failure to perform. In this case the contractors assigned their after-acquired property to the Surety Company as security for its loan of credit, with the right on its part to take possession of their entire plant, if they abandoned their con-

tract for the digging of the ditch. The rights of the Surety Company are surely as great and as well secured as were those of the defendant in the Hurley Case.

[4] The Minnesota rule that a mere general creditor who has not seized the mortgaged property by legal process, or acquired some lien upon it, cannot avoid an unfiled chattel mortgage, is the same as that announced in Wilson v. Leslie, 20 Ohio, 161, and which was applied to the present bankruptcy act in York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782. At and prior to the time the bankruptcy proceedings were instituted, the title to the contractors' plant had vested in the Surety Company. As between them, the right was in the latter to take possession of the plant on account of the abandonment of the completion of the ditching contract. The trustee, standing simply in the shoes of the bankrupt, cannot prevail. The motion of the Surety Company for a directed verdict should have been sustained.

The judgment of the trial court is therefore reversed, and the cause remanded for further action.