## HARTFORD ACCIDENT & INDEMNITY CO. v. COGGIN. *

No. 3858.

Circuit Court of Appeals, Fourth Circuit.

June 19, 1935.

*Writ of certiorari denied 56 S. Ct. 141, 80 L. Ed. ——

472

A. J. Fletcher, of Raleigh, N. C., and
C. H. Gover, of Charlotte, N. C. (Ruark &
Ruark, of Raleigh, N. C., on the brief), for
appellant. .

Lee Overman Gregory, of Salisbury, N.
C., for appellee.

Before PARKER and SOPER, Circuit Judges, and MEEKINS, District Judge.

SOPER, Circuit Judge.

The trustee in bankruptcy of W. E. Graham, a road contractor, brought suit in equity against Hartford Accident & Indemnity Company, a Connecticut corporation, the surety on certain bonds given by the contractor in connection with contracts between him and the State Highway Commissions of North and South Carolina. The court was asked to declare null and void certain transfers of personal property and choses in action from the contractor to the surety, contained in the applications for the bonds, and to direct the surety to pay to the trustee the value of the items involved. The application contracts were made more than four months before the institution of bankruptcy proceedings, but possession of the personal property was transferred by the contractor to the surety, after the contractor's default, within that period, and with knowledge on the part of the surety of the contractor's insolvent condition at that time. In addition, the surety received from the State Highway Commission of North Carolina two payments of money on account of deferred payments and retained percentages due the contractor for work done under the contracts prior to his default. These two payments, one made within the four months' period, and one after the adjudication in bankruptcy, were received while the surety through subcontractors was engaged, in accordance with the terms of the bonds, in completing the road construction after the contractor's default.

The District Judge held that the surety was entitled to retain the moneys received by it on account of current estimates and retained percentages, since it was subrogated to the rights of the State Highway Commission under the contract, and since the cost of completion of the work exceeded the amounts received; but that the surety must account for and pay over to the trustee the value of the personal property as of the time the surety received it, because in the court's opinion the transfers thereof, set out in the application agreements, were chattel mortgages invalid as to the trustee unless recorded under the registration laws of North Carolina; and since only one of the agreements was recorded, and that one within the four months' period, the transfers amounted to preferences under the bankruptcy statute, void as to the trustee in bankruptcy.

It was found by the District Judge that the value of the tools, plant, and equipment on March 29, 1929, when the surety took possession, was $20,036.75, and that the value of the material was $1,386.80, or $22,575.10 in all (including the cash sum of $151.55 received from the State Highway Commission of South Carolina). The same property items had been valued by the special master in the case at $7,250.80. The court decreed that the surety should pay the larger sum to the trustee with interest and the costs of the proceeding. From this decree the surety appealed.

The trustee in bankruptcy also appealed from the decree because it denied the trustee's right of recovery in two respects: (1) It denied recovery for 17 mules, valued by the trustee at $1,700, and delivered by the contractor to the surety on March 29, 1929, on the ground that 16 of them had been subsequently taken away from the surety by other claimants. (1 mule seems to have been overlooked.) (2) It denied the trustee's claim for the recovery of $1,276.98 collected by the surety from the State Highway Commission of North Carolina on June 28, 1929 (1½ months after bankruptcy), on account of work done by the bankrupt on one of the projects prior to his default; and also denied recovery for $4,317.75 collected by the surety from the same Commission on April 5, 1929, for work done by the contractor on another project prior to default. The trustee's position is that the amount due by the surety as fixed by the decree of the District Court should be increased by the addition of the aggregate of the three items above mentioned to the sum of $29,869.83.

It is important to note at this point that it is stipulated and agreed that the surety has expended in excess of all sums received by it from all sources in the completion of the road contracts, in expenses, cost of completion, and in payment of bills for labor and material incurred by the contractor, a very substantial sum for which the contractor is liable to the surety; and that the amounts paid by it on each project greatly exceed as to each the amount received therefrom as retained percentages or otherwise. Evidence offered on behalf of the surety shows that the amount of its loss, after giving credit for all amounts received by way of current estimates, final

estimates, and materials on all of the contracts, amounted to the aggregate sum of $47,555.80. From a comparison of this loss with the amount claimed by the trustee, to wit, $29,869.23, it is obvious that the crucial questions in the case are whether the surety was justified in taking possession on March 29, 1929, of the property (including the mules) valued at $24,275.10, and in receiving from the State Highway Commission $4,317.75 on April 5, 1929, and $1,276.98 on June 28, 1929. The application contract expressly provided that the contractor would perform all the conditions of the bond, and would at all times save harmless and indemnify the surety from all loss and expense which the surety might at any time sustain by reason of the execution of the bond, and would place the surety in funds to meet every such loss and expense, and that in any accounting between them, the surety would be entitled to charge for all disbursements made by it in good faith in regard to the subject-matter of the contract. The surety filed a claim in bankruptcy for losses suffered by it in performing the obligations of its bonds in a sum in excess of that herein claimed by the trustee. It follows that if the transactions, whereby the surety secured possession of the personal property and of the moneys mentioned, were free from the taint of unlawful preference and fraud, the trustee may not recover in this suit, for the surety would be entitled under section 68 of the Bankruptcy Act (11 US CA § 108) to offset its greater claim against the claim of the trustee and thus defeat any recovery on his part.

Five road projects in North Carolina and two in South Carolina were awarded to the contractor. In connection with each of them, he executed a written application or contract with the surety, in consideration of which, and of certain premiums paid, the surety executed its bonds in the aggregate sum of $222,584 to the two Highway Commissions respectively, guaranteeing performance of the contracts for road construction. The contractor entered upon the work and completed two of the projects in North Carolina and two in South Carolina in the year 1928; but he got into financial difficulties in regard to the remaining three contracts in North Carolina, and on March 29, 1929, delivered possession of the plant and materials to the surety. On April 2, 1929, he gave formal written notice to the Highway Commission of his default on the North Carolina projects, and on April 3, 1929, the Highway Commission notified the surety of the default and demanded that it arrange for the completion of the projects. The surety took possession of the equipment located upon the projects, the transfers being evidenced by written orders signed by the contractor; and the surety thereupon undertook the completion of the projects, awarding contracts therefor to certain subcontractors. Pursuant to these contracts and as part consideration therefor, the surety made a written transfer of all its right, title, and interest in the machinery and equipment located upon the projects, possession of which it had theretofore obtained. On May 17, 1929, creditors of the contractor filed an involuntary petition in bankruptcy against him, and he was adjudicated a bankrupt on June 14, 1929.

We shall consider first the transfer of possession by the contractor to the surety of the plant, equipment, and material. It is stipulated that the surety took possession of the equipment located upon the project with the consent of the contractor, under and by virtue of the application contracts, and the contracts with the State Highway Commission. The application contracts were executed on October 2, 1928, and although the District Court found as a fact that the contractor was even then insolvent, there was no finding that the surety had knowledge of this fact. Indeed the evidence tends strongly to show the contrary, for on that date the surety executed three bonds in the aggregate sum of $91,100, guaranteeing the performance of road contracts by the contractor. These bonds were in addition to others previously executed in the aggregate sum of $131,474. It is not reasonable to suppose that the surety would have entered into additional obligations with the knowledge that the contractor was financially unable to perform his promises.

Each of the application contracts contains a conveyance whereby the contractor as of the date thereof assigns, transfers, and conveys to the surety, all his right, title, and interest in the tools, plant, equipment, and materials that he may then or thereafter have upon the work, authorizing and empowering the surety and its agents to enter upon and take possession thereof, upon a condition in the words following: "This assignment shall be in full force and effect, as of the date hereof, should the

undersigned fail or be unable to complete the said work in accordance with the terms of the contract covered by said bond, or in event of any default on the part of the undersigned under the said contract." The District Court held and the parties to the case agree that these conveyances are in their nature chattel mortgages. We took the same view in Commercial Cas. Ins. Co. v. Williams, 37 F.(2d) 326, where a similar transfer was held void as to the trustee in bankruptcy, the document not having been recorded, and possession not having been taken by the surety until after the receiver in bankruptcy had been appointed. See, also, Title Guaranty & Surety Co. v. Witmire (C. C. A.) 195 F. 41; Mass. Bonding & Ins. Co. v. Kemper (C. C. A.) 220 F. 847; In re P. J. Sullivan Co. (C.·C. A.) 254 F. 660; U. S. F. & G. Co. v. Ryan, 124 Wash. 329, 214 P. 433, 39 A. L. R.' 109; In re Schilling (D. C.) 251 F. 966. Compare Angle v. Bankers' Surety Co. '(C. C. A.) 244 F. 401; In re Puget Sound Eng. Co. (D. C.) 270 F. 353; Wood v. U. S. F. & G. Co. (D. C.) 143 F. 424; In re Sachs (C. C. A.) 30 F.(2d) 510, 512. As to the nature of chattel mortgages in North Carolina, see Odom v. Clark, 146 N. C. 544, 60 S. E. 513.

The question then arises whether an unrecorded chattel mortgage given in North Carolina more than four months before the bankruptcy of the mortgagor, followed by delivery of possession within that period, is avoidable by the trustee in bankruptcy under section 60b of the Bankruptcy Act, 11 USCA § 96 (b). The effect to be given to this section in this case depends upon the interpretation of section 3311 of the Consolidated Statutes of North Carolina, which provides for the recording of deeds of trust or mortgages of real or personal property in that state. We had occasion to consider this statute in connection with section 60b of the Bankruptcy Act in the case of In re Cunningham, 64 F.(2d) 296, in which a controversy arose between the trustee in bankruptcy of a mortgagor and the mortgagee of certain property under a mortgage executed more than four months before the institution of proceedings in bankruptcy, but not recorded until after that period had begun. Speaking of section 3311 and its bearing upon section 60b of the Bankruptcy Act, we said [64 F.(2d) 296, 298]:

"Section 60 (b) of the National Bankruptcy Act, 11 U. S. C. § 96b, 11 USCA § 96 (b), provides in substance, amongst other things, that a transfer is voidable by the trustee in bankruptcy if it is required by law to be recorded and is not recorded prior to four months before the filing of the petition in bankruptcy; provided that the transferrer is then insolvent, the transfer then operates as a preference, and the transferee then has reasonable cause to believe that a preference will be effected.

"The application of this section to the facts of this case turns upon the question as to whether, under the law of North Carolina, the deed of trust was required to be recorded. Section 3311 of the Consolidated Statutes of North Carolina, provides that no deed of trust or mortgage for real or personal property shall be valid at law to pass any property as against creditors or purchasers for a valuable consideration except from the registration of the document where the grantor or mortgagor resides.

"The decisions of the Supreme Court of North Carolina interpreting this statute, which are binding upon federal courts in this respect, Firestone Tire & Rubber Co. v. Cross (C. C. A.) 17 F.(2d) 417, clearly hold that an unrecorded mortgage or deed of trust is valid under this section as between the parties and as against general creditors, unless the claims of the general creditors have become fastened upon the property, as by insolvency or bankruptcy proceedings, before the recording takes place. * * *

"We have to do in the pending case only with general creditors, for the rights of purchasers for a valuable consideration and of creditors armed with a lien or with legal process are not involved, and the mortgage was recorded before the institution of the bankruptcy proceedings.

"It follows, having reference to the rights of the general creditors of the bankrupt, that the recording of the transfer was not required by the North Carolina law in the sense in which that word is used in section 60b. The Supreme Court of the United States has held that Congress did not undertake in section 60 to hit all preferential transfers (otherwise valid) merely because they are not disclosed either by record or possession more than four months before the bankruptcy proceeding. The provision that transfers recorded within four months of the bankruptcy proceeding may be avoided, if the elements of a preferential transfer then exist to the knowl-

edge of the transferee, and if recording is required, has reference not to cases where recording is required in order to give validity to the transaction as between the parties, but only to those cases where recording is necessary to make the transfer valid as against those concerned in the distribution of the insolvent estate."

This case was reaffirmed by this court in Re Clark, 71 F.(2d) 513, and is applicable here; for no creditor in the pending suit had secured a lien upon the property prior to bankruptcy, and the transfer of possession of the property to the surety-mortgagee before bankruptcy had the same effect under the North Carolina law as if the mortgage had been recorded. Cowan v. Dale, 189 N. C. 684, 128 S. E. 155. It follows that the right of the surety to the property transferred is superior to the claim of the trustee in bankruptcy. As we said in Burrowes v. Nimocks, 35 F.(2d) 152, 159: "It is the settled rule in bankruptcy that, where a lien is good as between the parties, but, because of lack of registration or possession, not good against lien creditors, its registration, or in a proper case the taking of possession of the property, before bankruptcy, will render it valid as against the trustee in bankruptcy, and will not be held to be the obtaining of a preference." See, also, Johnson v. Burke Manor Bldg. Corp. (C. C. A.) 48 F. (2d) 1031, 83 A. L. R. 1273.

█ It is also contended that the transfers contained in the application contracts, when viewed as chattel mortgages, are void for want of a specific description of the chattels; but the description is not inadequate, for North Carolina courts apply the general rule that a description in a mortgage is sufficient if it points out the subject-matter with such particularity as to enable it to be identified. Spivey v. Grant, 96 N. C. 214, 2 S. E. 45; Harris v. Woodard, 96 N. C. 232, 1 S. E. 544; Harris v. Allen, 104 N. C. 86, 10 S. E. 127; Davis v. Turner (C. C. A.) 120 F. 605.

█ It is suggested, however, that the mortgagee should be denied the protection which would ordinarily flow from the application contracts, because the delivery of possession was attended by circumstances of fraud. The special master, while holding prior to the decision of this court in Re Cunningham, 64 F.(2d) 296, that the chattel mortgages were void as to the trustee in bankruptcy for lack of registration, was of the opinion, nevertheless, that the surety had come into court with clean hands. The District Judge, also entertaining the opinion that the application contracts were required to be recorded under the North Carolina law, found that the contracts were purposely withheld from record in order to afford the contractor an opportunity to obtain credit in the prosecution of his work. He also found that the contractor delivered the chattels to the surety for the fraudulent purpose of hindering, delaying, and obstructing his creditors, and with the belief that the surety, in letting subcontracts for the completion of the projects, would give preference to a new company which he proposed to organize.

Provision for the use of plant, equipment, and material, in case of the default of a contractor on public works, is usually found in the bond of his surety; and information as to the details of the contract and the bond is usually available whether or not the documents are registered on the official records relating to the transfers of personal property. There is no evidence that surety application contracts are usually recorded in the property records, and we think that no inference of fraud may fairly be drawn from the failure to record them in this case, especially in view of the publicity and general knowledge that attends public works. A sinister purpose to deceive the public and to induce the extension of undue credit to a contractor is not likely to be held by a surety which has shown its confidence in him by agreeing, in the event of his default, to pay all bills for labor and material furnished to the work for which he may be liable.

█ Nor do we find that the surety secured possession of the goods by an agreement with the contractor, fraudulent as to creditors. The contractor was financially unable to proceed with the work, but was, nevertheless, reluctant to abandon his losing venture. He finally agreed, however, to turn over possession of the property to the surety, in accordance with his promises in the application, so that the work might be completed; and he was assured that if he could enlist the aid of other responsible contractors, he and his associates would be permitted to bid, and would be given the work of completion if they were the low bidders. Possession of the machinery, equipment, and other property was thereupon delivered to the surety. The contractor secured the support of other successful road building contractors and

made a bid to complete the projects; but this bid, being approximately $7,000 higher than the bids of other contractors, was rejected. The surety assigned all its right, title, and interest in the equipment on the projects to the new contractor, and in the new contracts it was agreed that the contractors should be given the right to use the equipment and material as part of the consideration for their work. After these contracts were performed, the plant seems to have been left upon the site of the projects, and the surety made no effort to return it to the contractor or to his trustee in bankruptcy who had been in the meantime appointed. The surety merely notified the trustee that it made no further claim to the plant and equipment, and that the trustee was at liberty to take possession thereof.

■ It was held in Title Guaranty & Surety Co. v. Witmire (C. C. A.) 195 F. 41, 44, with regard to similar contracts, that the consideration for the surety's guarantee was not only the premium on the bond, and the right to exhaust any funds due or to become due to the contractor by the public authority, but also the additional security of the contractor's plant, with the right to use it in the completion of the work and to apply its value towards the reimbursement of any loss that the surety might sustain; and if, after being fully reimbursed, any of the property should remain in the hands of the surety, it would be the surety's duty to return it. If this view be taken of the application contracts in the instant case, it is obvious that the trustee has no valid claim. If, on the other hand, the view be taken that the surety derived from the application contracts merely the right to use the plant to complete the work, it would be the surety's duty upon completion to return the property or to account for its value at that time; and this duty would not be performed by abandoning the property upon the site of the work and notifying the contractor or his trustee in bankruptcy of its location. But even if we apply the less favorable theory in this case, and charge the surety with the full value of the plant at its highest estimate, it is still clear that the trustee has no case, for against his claim, the surety would be entitled to offset the much greater debt due it by the contractor.

■ It is suggested in the opinion of the District Court that the surety waived any security it may have had under the application contracts since it proved its total claim as an unsecured debt and participated as such in the election of a trustee. Compare O'Gara Coal Co. (C. C. A.) 12 F. (2d) 426, 46 A. L. R. 916. It appears, however, that the filing of the claim as unsecured was the result of inadvertence, for the instruments evidencing the defendant's security were attached to its claim; and shortly thereafter, when the error was discovered, an amended secured claim was filed with the permission of the referee, and with the consent and stipulation on the part of the trustee that reference to the security had been previously omitted through inadvertence. Under these circumstances, the surety was not estopped to claim the security. See Hutchinson v. Otis, Wilcox & Co., 190 U. S. 552, 23 S. Ct. 778, 47 L. Ed. 1179.

■ The correctness of the decision of the District Court cannot be questioned in the conclusion that when the surety entered upon the completion of the work, it was entitled to receive from the State Highway Commission the moneys earned by the contractor but not paid to him before he abandoned the work. The contract between the contractor and the State Highway Commission provided that in case of the contractor's default, the State Highway Commission might complete the work at the contractor's expense, and pay the costs and charges thereof from any moneys then due or to become due the contractor under the contract. The contract between the contractor and the surety provided that the surety should be subrogated to all rights of the contractor under the contract and assigned to the surety all deferred payments and retained percentages, and any and all moneys and properties that might be due and payable to the contractor at the time of a breach or default, or that might thereafter become due and payable to him on account of the contract, and that the proceeds of the payments and properties should be the sole property of the surety, and be credited by it upon any loss sustained by it under the bond. It is the general rule that, independent of assignment, the surety on a contractor's bond, who completes the contract on default of the principal, is subrogated to the rights of the obligee, and to the extent necessary to reimburse himself, has an equity in the funds due the principal. The obligee, upon default, is of course entitled to apply all unpaid moneys towards the performance

of the contract, and it necessarily follows that when the surety performs the contract, he is subrogated to the rights of the obligee, and is entitled to the moneys unpaid so far as necessary to reimburse him for his loss. Lacy v. Maryland Casualty Co. (C. C. A.) 32 F.(2d) 48. The provisions of the contracts mentioned also support the right of the surety completing the work to receive the moneys due or to become due the contractor at the time of his default.

The decree of the District Court is reversed, and the case remanded, with directions to dismiss the bill of complaint, costs to be paid by appellee and cross-appellant.

Reversed and remanded.