In re STINEMAN.

Appeal of CHASE NAT. BANK OF CITY OF NEW YORK.

No. 9012.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 24, 1946.

Decided May 7, 1946.

---

O'CONNELL, Circuit Judge, dissenting.

Milbank, Tweed & Hope, of New York City, John G. Buchanan and Smith, Buchanan & Ingersoll, all of Pittsburgh, Pa., and Thomas P. Farley, of New York City, on the brief, for appellant.

Harry Doerr, of Johnstown, Pa., for appellee.

Before BIGGS, GOODRICH and O'CONNELL, Circuit Judges.

BIGGS, Circuit Judge.

The appeal at bar presents an anomaly in the administration of the Bankruptcy Act. The facts are as follows. On June 10, 1926 Harvey C. Stineman was adjudicated a bankrupt upon a voluntary petition and the case was referred to a referee. Among the principle assets of the estate was an undivided one-sixth interest in a large acreage of valuable coal lands. Some of these lands were being mined by lessees and were producing substantial royalties. The value of the interest of the bankrupt estate in the realty was appraised at $90,000. United States National Bank of [1] Johnstown and First National Bank of South Fork had procured judgments which were, respectively first and second liens on the bankrupt's interest in these coal lands.

General claims filed against the estate amount to about $225,000. Included among these is the claim of the appellant, Chase National Bank of the City of New York as successor to Equitable Trust Company.[2] Chase's claim as a general creditor was allowed on May 14, 1935 in the amount of $55,231.98. This represented a reduction of the bank's original claim which had been secured in part by collateral given by the bankrupt. The reduction was ordered by the referee upon exceptions filed to Chase's claim by National Bank of Johnstown and South Fork Bank. On January 8, 1927 National Bank of Johnstown filed a secured claim in the amount of $10,000, reciting as its security the lien of the judgment hereinbefore referred to. Thereafter, on July 14, 1932, it filed another claim designated by it as an "Amended Liquidated Claim" for $13,685 including interest. The latter claim contains no recital of any security and appears to be a general claim intended to take the place of the original secured claim. On August 3, 1944 an order was entered by Judge Gibson, affirming an order of the referee which reduced National Bank of Johnstown's claim to $10,000. On June 29, 1926 South Fork Bank filed a claim in the amount of $18,463.45. It recited the security of the judgments against the bankrupt. We omit any discussion as to whether this claim was timely filed since it is presently unnecessary to resolve that question.

On December 31, 1929, approximately three and a half years after the adjudication, an important meeting of creditors was held by the referee. What transpired at this meeting is far from clear from the record offered to this court. It would appear, however, that P. J. Little, Esquire, at that time was serving as counsel for Chase and other creditors as well as counsel for the trustee in bankruptcy.[3] Chase was represented also by another counsel, Arthur John Keefe, Esquire, a member of the bar of New York. The trustee was present, as was the bankrupt and certain of the general creditors. It was believed that if National Bank of Johnstown and South Fork Bank foreclosed on their liens, little, if anything, would be left for the general creditors. Mr. Little suggested that the estate "be divided into two items; one item showing funds arising wholly from real estate which does not include any of the leases or the funds from any of the leases; the other fund should be made up of all royalties, rentals, or dividends on stocks or bonds. The first fund to go to the first judgment creditor, the second fund to be divided pro rata among all the creditors." Whether the referee ever made an order in support of this division is not clear. In any event the estate was administered as if an order supporting the division of the estate into the "two items" had been made, National Bank of Johnstown and South Fork Bank assenting to the

---

[1] The word "of" is emphasized in this opinion in order to distinguish this institution from its successor banking corporation, United States National Bank *in* Johnstown.

[2] We will refer to the claim hereafter in the opinion as if at all times it had belonged to Chase.

[3] Later, Mr. Little, becoming aware of the conflict of interests, ceased to represent Chase.

course followed and forebearing to realize on their liens.

The trustee in bankruptcy presently insists that what Mr. Little stated at the meeting of December 31, 1929 was prompted by Chase and amounted to a stipulation by Chase agreeing to the proposed division. It is not clear why the trustee should take the position that Mr. Little was making the proposal for Chase rather than on behalf of the trustee himself or of the other creditors, i.e. Hartwell and Lester, Second National Bank of New Haven and Lester Coal Company, which he also represented. Mr. Keefe who did represent Chase was present. Apparently he did not protest the proposed division. The trustee contends that Chase by this lack of protest and by its subsequent actions, which will be referred to at a later point in this opinion, is estopped from asserting that National Bank in Johnstown and South Fork Bank are not entitled to be paid as secured creditors.

Precisely what National Bank of Johnstown or its successor, National Bank in Johnstown, received from the income from the real estate is not clear but is does appear that it was paid at least $1364.76. It is clear that National Bank of Johnstown and National Bank in Johnstown received seven dividends from the general estate paid between November 27, 1935 and March 16, 1942, or a total of $2435.06.[4] South Fork Bank also received dividends under the seven schedules of distribution filed by the referee but the amounts received by this bank do not appear in the record. Apparently, South Fork Bank received no money from the real estate of the bankrupt.

Section 65, sub. a, of the Bankruptcy Act provides, "Dividends of an equal per centum shall be declared and paid on all allowed claims, except such as have priority or are secured."[5] Section 57, sub. h, of the act provides, "The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors, or by such creditors and the trustee by agreement, arbitration, compromise or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance. * * *"[6]

It is fundamental that the value of securities held by creditors must be valued before they may participate in distributions from the general estate and dividends may be paid only on the unpaid balances. In re Rogers, D.C., 20 F.Supp. 120, 133. Cf. Hartford Accident & Indemnity Co. v. Coggin, 4 Cir., 78 F.2d 471, 477; see also Hiscock v. Varick Bank of New York, 206 U.S. 28, 40, 27 S.Ct. 681, 51 L.Ed. 945. The dividends paid to National Bank of Johnstown, to its successor and to South Fork Bank were not paid pro rata upon the balance of the respective claims after the values of the judgment liens were deducted. No deductions were ever made. As to this fact all parties agree. The participants in the bankruptcy proceeding simply ignored the pertinent provisions of the Bankruptcy Act. It is asserted that this resulted in a substantial benefit to the general creditors but we cannot test the accuracy of this assertion from the present record. National Bank of Johnstown and South Fork Bank in their brief state: "As the result of the lien creditors foregoing a forced sale of the real estate, a large amount in royalties was received by the Trustee, and distributed to general creditors, as is evidenced by the seven dividends." We will assume for the purposes of this opinion that royalties from the coal lands were received into the fund for the general creditors: viz., into Mr. Little's second "item," and that seven dividends could be paid because of the receipt of royalties into the general creditors' fund. This result, however, cannot justify the course of the administration in

---

[4] See appendix pp. 58a–60a.

[5] The section quoted appeared in the Act of 1898, 30 Stat. 563, and has remained unchanged. See 11 U.S.C.A. § 105, sub. a.

[6] This language which appeared in the 1898 act has also remained unchanged. 30 Stat. 560. See 11 U.S.C.A. § 93, sub. h.

the case at bar. The course pursued was not only without statutory justification but, as we have indicated, probably was unnecessary for the reasons set out in the next paragraph.

▇▇ If, as National Bank in Johnstown and South Fork Bank presently assert, the appraisal of Stineman's interest in the coal lands was $90,000, the trustee would have been justified in paying off the liens by money borrowed upon trustee's certificates; or, the general creditors could have effected a composition under Section 74 of the Bankruptcy Act, 11 U.S.C.A. § 202; or, in any event, National Bank of Johnstown and South Fork Bank could have availed themselves of the provisions of Section 57, sub. h, hereinbefore quoted, and could have had the value of their respective securities ascertained and credited against their claims in order that they might receive dividends from the general estate upon the balances. The trustee seems to have concluded that the banks could have foreclosed their liens but this was not the case. They had filed their claims in the bankruptcy court and were subject to the jurisdiction of that tribunal. The equity of the general estate in the coal lands was substantial. Stineman's interest in them could have been sold under order of the referee, free and clear of all liens and encumbrances, the liens and encumbrances to attach to the proceeds of the sale, or Stineman's interest could have been sold subject to the liens. In any event a substantial fund should have been created for the benefit of the general creditors. How much has been created for the general estate by the course pursued by the referee and trustee cannot be determined on the very incomplete transcript offered to us. From the dividends paid to National Bank of Johnstown or National Bank in Johnstown we may surmise that general creditors have received about 15 cents on the dollar by reason of the seven dividends already paid. But we do not know what

assets remain in the general estate. In view of the deficiencies of the record further speculation would be futile.

▇▇ The parties have demonstrated, as we have indicated, a complete disregard for the pertinent provisions of the Bankruptcy Act. Those provisions were not intended by Congress to apply only to certain individuals or under certain circumstances. Congress intended the provisions of the Act to be of universal application and to establish principles which Congress deemed necessary for the public good. The participants in Stineman's bankruptcy proceeding were bound by the law. National Bank in Johnstown and South Fork Bank may not receive the benefits of their securities and also be treated as general creditors to the full extent of their claims. They may not have the benefit of both positions and the liabilities and obligations of neither. Under the law an attempt to assert an estoppel against Chase or any other creditor which would effect such a result is futile.[7]

▇▇ Since National Bank of Johnstown and National Bank in Johnstown and South Fork Bank have received dividends from the general estate to the full extent of their claims as allowed without having the value of their securities ascertained or deducted as provided by law they must be deemed to have elected to be treated as general creditors and to have waived their rights to the security of their judgment liens. See In re O'Gara Coal Co., 7 Cir., 12 F.2d 426, 46 A.L.R. 916, certiorari denied Chicago Title & Trust Co. v. Gardner, 271 U.S. 683, 46 S.Ct. 633, 70 L.Ed. 1150, and the cases cited therein; Coggin v. Hartford Accident & Indemnity Co., D.C. 9 F.Supp. 785. It follows that since the receipt of the first dividend from the general estate, paid on January 27, 1935, National Bank of Johnstown and South Fork Bank became entitled to share in the bankruptcy estate only as general

---

7 For example, if the trustee in bankruptcy, the banks named and all other creditors had entered into a covenant under seal to administer the estate in such a way that the secured creditors might retain their securities while sharing pro rata in the general estate on the face amount of their claims, such a covenant would have been void as against the public policy expressed by Congress in the Bankruptcy Act.

creditors. The order of the court below, from which Chase has appealed, effected the contrary result.[8] Consequently, it must be reversed.

■ It does not appear from the record filed in this court precisely what is the relationship existing between National Bank in Johnstown and its predecessor, National Bank of Johnstown. If the former assumed the obligations of the latter, National Bank in Johnstown is liable for, and should be compelled to refund to the trustee, the sums of money gotten by it from the real estate unless the amounts to be received by the bank by way of future dividends from the general estate will be sufficient to afford a set-off. If National Bank in Johnstown did not assume the liabilities of National Bank of Johnstown, and future dividends to be received by the former will be insufficient to afford a set-off, National Bank of Johnstown or its representatives should be held to an accounting as the circumstances and the law will warrant. In view of the incomplete and chaotic record before us it would be futile to discuss this subject further in this opinion.

In conclusion we point out that the case at bar is just short of twenty years old. The proceedings should be terminated as rapidly as possible.

The order appealed from will be reversed and the cause will be remanded with directions to proceed in accordance with this opinion.

O'CONNELL, Circuit Judge (dissenting).

I cannot agree with the conclusions reached by the majority. What was here done was at the request of the general creditors, or at least the principal general creditor (the appellant), with the knowledge and approval of the trustee. It was motivated by a desire on the part of the secured creditors (the appellees) to co-operate in working out a plan of liquidation which the trustees and representatives of the general estate believed would realize to the fullest extent on the assets of the bankrupt. After approximately twenty years application of the terms of the participation agreement, promoted at its instance and for its express benefit, the appellant now seeks to repudiate it.

The record discloses that the banks in their claims set forth the nature of the security held by them. The value of the interest of the bankrupt's estate in the coal lands was appraised at $90,000. The claim of the National Bank of Johnstown was but $10,000; that of the First National Bank of South Fork, $18,463.45. These claims were secured by first and second liens respectively on the bankrupt's interest in the aforesaid coal lands. If the appraisal was accurate, and the majority finds, "The equity of the general estate in the coal lands was substantial," the claims were fully protected in their entirety, and it was the acknowledgment of this fact by all that led to the participation agreement whereby the secured creditors also shared in the dividends from the general estate. Must the receipt of dividends by the secured creditors under such circumstances compel the conclusion under applicable law that the National Bank of Johnstown and the First National Bank of South Fork have waived their rights to the security of their judgment liens and have elected to be treated as general creditors? I do not think so.

I believe sanction may be found for the action of the parties in the second clause of Section 57, sub. h of the Act, which provides, "The value of securities held by secured creditors shall be determined * * * by such creditors and the trustee by agreement, arbitration, compromise or litigation * * *." The net result of what was here accomplished was the determination of the value of securities held by the banks to be the amount of their claims, the parties providing the means by which said amounts would be liquidated. "Among the modes of evaluation to which the bankruptcy court may resort, evaluation by means of an agreement between the creditor and the trustee is the most desirable". 3 Collier on Bankruptcy, 14th Ed., 282.

---

[8] See In re Stineman, D.C., 61 F.Supp. 151, reversing D.C., 56 F.Supp. 190. It should be observed that the earlier decision of the District Court was in accord with our opinion.

In this, the general estate was not harmed, but rather benefited.

The nature of the asset against which the security attached must be borne in mind. Every ton of coal mined reduced the equity of the lien creditors. This is not a case of a pledgee in possession who may close out his security when the pledgee is free to choose his time to sell or where the lienor may liquidate his security under his agreement with the debtor. True it is that once a petition in bankruptcy is filed, the holder of a lien on the property in the custody of the court may not foreclose without permission of the bankruptcy court, but were such authority sought the court would be guided by what under the circumstances appeared to be in the best interest of all the parties concerned. True also, the trustee might have liquidated the claims of the judgment creditors by various other means, but, obviously, the banks would not have objected to such methods had the trustee or the creditors indicated a desire so to do. By the method adopted, the parties concerned crystallized the best interests of all by an actual conversion into money of the assets in the hands of the trustee against which the lien attached.

The equity in the coal property being admittedly greater than the liens of the judgment creditors, shall we say then that such judgment creditors must stand idly by until all the coal is mined except enough to cover secured claims? Or, under their security, are the lien creditors entitled to all the royalties received from the coal lands until their claims are paid in full?

As to such royalties, the effect of the agreement here was not that of the secured creditors receiving dividends with the general creditors on any balance over and above their securities, but rather of the general creditors receiving a dividend upon their claims out of the security held by the judgment creditors before such secured claims were paid in full. The sharing by the secured creditors in the dividends paid from the general estate was not intended by any of the parties to put the secured creditors in position to receive payment of more than the value of their security, but rather to more speedily pay off the secured claims. I cannot find in such action, to the disadvantage of the secured creditors, adopted for the benefit of the general estate, a waiver by the secured creditors of their rights to the security of their judgment liens. "Acts relied on as a waiver or a release must either be done with intent to waive or to release or else they must be such as might reasonably have led, and in point of fact did lead, other persons to act to their hurt upon the assumption that the waiver or release had been made." Maxwell v. McDaniels, 4 Cir., 1912, 195 F. 426, 428, 429. Bankruptcy courts are not powerless to act when equity and good conscience dictate the determination of equitable relief. Hutchinson v. Otis, 1 Cir., 1902, 115 F. 937, affirmed Hutchinson v. Otis, Wilcox & Co., 190 U.S. 552, 23 S.Ct. 778, 47 L.Ed. 1179. The filing of a general claim, although allowed and dividends paid thereon, does not estop a creditor from afterwards claiming his right to preferential payment where no injury to another is shown. Wuerpel v. Commercial Germania Trust & Savings Bank, 5 Cir., 1916, 238 F. 269. A waiver of rights will only be construed where the conduct of the claimant clearly evidences his intention so to elect.[1] Thomas v. Taggart, 1908, 209 U.S. 385, 28 S.Ct. 519, 52 L.Ed. 845; In re Kaplan & Myers, 3 Cir., 241 F. 459.

I am unable, therefore, to agree with the majority that the appellees made a final election to share in the bankrupt estate only as general creditors when they agreed to the suggestion of the appellant. This case having been in litigation for approximately twenty years, I agree with the suggestion made by the majority that these proceedings be terminated as rapidly as possible. The record should be returned so that the appellees might in the light of the changed attitude of the appellant elect their remedy, with the subsequent adjustment in accounting that might result thereby, the winding up of the affairs of the bankrupt providing ample opportunity therefor.

---

[1] Both the United States National Bank of Johnstown and the First National Bank of South Fork have carefully revived their judgments during each five year period and in doing so made the trustee in bankruptcy in this estate a party to the proceedings.