UNITED STATES NATIONAL BANK ET AL. *v.* CHASE NATIONAL BANK ET AL.

No. 371. Argued February 7, 1947.—Decided April 14, 1947.

*Robert I. Rudolph* argued the cause and filed a brief for petitioners.

*William Dean Embree* argued the cause and filed a brief for the Chase National Bank, respondent.

MR. JUSTICE MURPHY delivered the opinion of the Court.

A problem arising under the Bankruptcy Act is presented by the unique facts of this case.

On June 10, 1926, Harvey C. Stineman was adjudicated a bankrupt upon a voluntary petition and the case was referred to a referee. The principal asset of the bankrupt estate was an undivided one-sixth interest in a large acreage of valuable coal lands, a large portion of which was operated by lessees and was producing substantial royalties. The value of the interest of the bankrupt estate in this asset is alleged to have been appraised at $90,000.

More than four months prior to the date when the petition was filed and the adjudication made, the United States National Bank of Johnstown, Pa., and the First National Bank of South Fork, Pa., had procured judgments against Stineman. These two judgments constituted first and second liens, respectively, on Stineman's interest in the coal lands. This interest had no other encumbrances upon it.

On January 8, 1927, the Johnstown bank filed its secured claim in the bankruptcy proceedings in the amount of $10,000, reciting as its security the first lien on the interest in the coal lands. This claim was allowed. Subsequently, in 1932, the Johnstown bank filed an amended claim in the amount of $13,685, interest accruing after bankruptcy having been added to the original claim. The amended claim was allowed in the amount filed and formed the basis for the bank's participation in the dividends from the general fund, mentioned hereinafter. A court order in 1944 reduced this claim to $10,000.

The South Fork bank, on June 29, 1926, filed its secured claim with the referee for $11,290, reciting the second

lien as its security, along with unsecured claims for
$7,173.45. Dividends from the general fund were sub-
sequently paid to the bank on the basis of the full amount
of all its claims, $18,463.45.

Numerous general, unsecured claims were filed by other
creditors, approximating $225,000 in amount. Included
among these was the claim of the Chase National Bank of
the City of New York, a claim which was allowed in the
amount of $55,231.98.

The referee held a meeting of the creditors on December
31, 1929, more than three and a half years after the adjudi-
cation. The motive for this meeting appears to have
been the fact that the Johnstown and South Fork banks,
the judgment lien creditors, were pressing for payment
of their secured claims. This meeting was attended by
the bankrupt, the trustee in bankruptcy and representa-
tives of the two judgment creditors, the Chase National
Bank and certain other general creditors. Apparently not
all of the general creditors appeared at this meeting. The
consensus of opinion among those present was that the
real estate had a value in excess of the liens but that "if the
lien creditors foreclosed upon their liens, little, if any-
thing, would be left for general creditors."

One of the attorneys present, P. J. Little, then made
a suggestion. Mr. Little at this time was serving as
counsel for the trustee, the Chase National Bank and sev-
eral other general creditors. His suggestion was "that
under the law the estate should be divided into two items;
one item showing funds arising wholly from real estate
which does not include any of the leases or the funds from
any of the leases; the other fund should be made up of
all royalties, rentals, or dividends on stocks or bonds.
The first fund to go to the first judgment creditor, the
second fund to be divided pro rata among all the
creditors."

32

The parties apparently agreed to this proposal. Although no supporting order of the referee appears in the record, the administration of the bankrupt estate proceeded as if a supporting order had been entered. The two judgment lien creditors assented to this course of events and it is asserted that all the creditors understood that the liens were to remain intact until the underlying claims had been paid in full.

Thereafter, four dividends were declared and distributed from the real estate fund, while seven dividends were declared and distributed from the general fund. The Johnstown bank received at least $1,364.76 from the real estate fund; the South Fork bank appears to have received nothing from that fund. Both of these banks shared with the other creditors in the seven distributions from the general fund, the Johnstown bank receiving $2,435.06 and the South Fork bank, $3,285.35. No exceptions were ever taken to any of the various orders of distributions. In addition, these two banks have carefully revived their judgments during each five-year period, making the trustee in bankruptcy a party to the proceedings.

In October, 1942, the Chase National Bank filed petitions for a decree to the effect that the two banks had waived their liens by sharing in the distributions from the general fund along with the general creditors and that the Johnstown bank should be compelled to return the $1,364.76 it had received from the real estate fund. The referee, however, held that both the Johnstown and South Fork banks were entitled to maintain their positions as lien creditors and at the same time participate in the distributions from the general fund. The District Court reversed the referee's decision, feeling that participation in distributions from both the real estate and general funds was contrary to accepted bankruptcy practice. *In re Stineman,* 56 F. Supp. 190. On rehearing, the District

Court changed its mind; it became convinced that the Chase National Bank had recommended the arrangement, had acquiesced in its execution and was now estopped from objecting. *In re Stineman,* 61 F. Supp. 151. The Third Circuit Court of Appeals reversed, holding that the parties had completely disregarded the pertinent provisions of the Bankruptcy Act and that the Johnstown and South Fork banks had waived their liens and were entitled to share in the bankruptcy estate only as general creditors. *In re Stineman,* 155 F. 2d 755.

Sections 65 (a) and 57 (h) of the Bankruptcy Act are the ones pertinent to this case. Section 65 (a) provides: "Dividends of an equal per centum shall be declared and paid on all allowed claims, except such as have priority or are secured." 11 U. S. C. § 105 (a). Section 57 (h) provides: "The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors, or by such creditors and the trustee by agreement, arbitration, compromise or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance. Such determination shall be under the supervision and control of the court." 11 U. S. C. § 93 (h).

Under these provisions, there are several avenues of action open to a secured creditor of a bankrupt. See 3 Collier on Bankruptcy (14th ed.) pp. 149–157, 255–259. (1) He may disregard the bankruptcy proceeding, decline to file a claim and rely solely upon his security if that security is properly and solely in his possession. *In re Cherokee Public Service Co.,* 94 F. 2d 536; *Ward* v. *First Nat. Bank,* 202 F. 609. (2) He must file a secured claim, however, if the security is within the jurisdiction of the bankruptcy court and if he wishes to retain his secured status, inas-

34

much as that court has exclusive jurisdiction over the liquidation of the security. *Isaacs* v. *Hobbs Tie & Timber Co.*, 282 U. S. 734. (3) He may surrender or waive his security and prove his entire claim as an unsecured one. *In re Medina Quarry Co.*, 179 F. 929; *Morrison* v. *Rieman*, 249 F. 97. (4) He may avail himself of his security and share in the general assets as to the unsecured balance. *Merrill* v. *National Bank of Jacksonville*, 173 U. S. 131; *Ex parte City Bank*, 3 How. 292, 315.

Section 57 (h) is a codification of this fourth possibility. It permits the secured creditor to receive dividends along with the general creditors only on the balance remaining after the value of the security has been determined and deducted from the claim. This rule, commonly known as the bankruptcy rule, is designed to preclude any unwarranted advantage from accruing to the secured creditor. Grounded upon the statutory principle of equality and ratable distribution, it prohibits the secured creditor from reaping the whole benefit of his security while simultaneously taking dividends from the general assets on the basis of his entire claim as if he had no security. This rule differs from the one in equity, which allows the secured creditor to receive dividends on the full amount of his claim, crediting all dividends received and reserving the security against any deficiency. *Merrill* v. *National Bank of Jacksonville, supra.* And see 3 Collier on Bankruptcy (14th ed.) p. 153; Hanson, "The Secured Creditor's Share of an Insolvent Estate," 34 Mich. L. Rev. 309; 12 Ford. L. Rev. 77.

It is argued that the plan adopted in this case cannot be sanctioned under the foregoing principles. This plan allegedly called for the use of something similar to the equity rule of distribution. The judgment lien creditors were to retain their liens while sharing fully in the dividends from the general funds as if they had no liens, crediting the

dividends received against their claims. But § 57 (h) is said plainly to outlaw the use of that rule; if the judgment lien creditors wished to retain their liens, they could share in the dividends only to the extent that their claims exceeded the value of their liens. Since they did not follow the provisions of § 57 (h), the conclusion is reached that they have waived their liens and must now be considered solely as unsecured creditors.

At this point it should be noted that the incomplete record before us fails to reveal the value of the interest in the coal lands to which the liens attached. The judgment lien creditors claim that the value was fixed at $90,000, but no such valuation appears in the record. That it might be less than $90,000 is indicated by the statement of these creditors that if they had foreclosed on their combined liens of $21,290, "there would have been little, if anything, left for the general creditors." But in the setting of this case, we believe it immaterial whether the value of the interest in the coal lands was greater or less than the amount of the secured claims. In either event, the problem before us concerns itself with the present validity of the liens. Has the conduct of the judgment lien creditors been such as to constitute a waiver of their judgment liens? That question we answer in the negative.

The fact that the judgment lien creditors received general dividends contrary to the scheme of § 57 (h) does not necessarily mean that they thereby waived their liens. Nothing in the language of § 57 (h) or of any other section of the Act makes such a receipt the necessary equivalent of a waiver. It is generally true that participation by a secured creditor in distributions from the general assets on the basis of his full claim indicates a waiver of the security and an election to be treated as an unsecured creditor. See *In re O'Gara Coal Co.*, 12 F. 2d 426. But that is not

an invariable result flowing from the application of any rigid statutory rule. The result depends, rather, upon the circumstances surrounding the receipt of the dividends. And in exceptional cases, those circumstances may demonstrate the continued vitality of the security as well as indicate that it would be inequitable to declare the security forfeited. See *Wuerpel* v. *Commercial Germania Trust & Savings Bank,* 238 F. 269; *Maxwell* v. *McDaniels,* 195 F. 426; *Hartford Accident & Indemnity Co.* v. *Coggin,* 78 F. 2d 471; *Standard Oil Co.* v. *Hawkins,* 74 F. 395.

In the rare case where there is reasonable doubt as to whether a waiver has occurred, a careful examination must therefore be made to determine the conditions under which the dividends from the general assets were distributed to the secured creditor. And that examination must be made in the light of the recognized principles of equity. It has long been established that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 240; *Pepper* v. *Litton,* 308 U. S. 295, 304. In determining whether a waiver of liens has taken place, the bankruptcy court must accordingly look to the equities involved as well as to the intention of the parties. A waiver may be inequitable or unfair to the secured creditor; the receipt of dividends may not have caused permanent injury to the unsecured creditors; the dividends may have been received under a mistake of law or fact or pursuant to court approval; the objecting party may be estopped from questioning the validity of the liens. Such equitable considerations may well be decisive of a waiver or forfeiture in a particular case.

It is at once evident in this case that the judgment lien creditors received dividends from the general fund in good faith and without any intent to waive their liens. The principal asset of the estate was the interest in the coal lands and it was that interest to which the liens attached.

Representatives of various general creditors believed that it would be to their advantage to have this interest remain intact, without being liquidated in whole or in part in order to satisfy the liens. Their thought was that by maintaining undiminished the royalties and rentals from this interest the unsecured claims could more rapidly be satisfied. To that end it was proposed that the judgment lien creditors refrain from immediate liquidation of their claims and share in the dividends from the general fund, a fund which included the royalties and rentals from the interest in the coal lands. The judgment lien creditors accepted this proposal, being willing to postpone any immediate realization of their security. But they did so with the distinct understanding that their liens were not forfeited and they took pains to renew the underlying judgments every succeeding five years in order to keep the liens alive. There is thus absent any element of an intentional waiver of the liens or any action inconsistent with a desire to retain the liens in the circumstances surrounding the receipt of the dividends by the judgment lien creditors. Cf. *Thomas* v. *Taggart,* 209 U. S. 385; *In re Kaplan & Myers,* 241 F. 459.

Nor do we perceive any equitable reason why these liens should be declared forfeited. The incomplete record in this case does not indicate whether the referee or the bankruptcy court ever gave formal approval to the agreement under which the judgment lien creditors received dividends along with the unsecured creditors. But the bankruptcy proceedings went forward for more than twelve years as if such approval had been given, authorization being given for the distribution of numerous dividends pursuant to the plan. Certainly the agreement had the implied, if not the express, blessing of the referee and the bankruptcy court. Hence the judgment lien creditors cannot be accused of having participated in a plan which was unknown to, or disapproved by, those responsible for the proper admin-

istration of the proceedings. A forfeiture of the liens would only penalize unfairly the judgment lien creditors, who joined the plan in good faith and without any apparent intention of harming others or of securing any undue advantage for themselves.

It is further significant that the plan was proposed by an attorney for Chase National Bank, the general creditor now objecting. Apparently not all the general creditors were present or represented at the meeting on December 31, 1929, when the proposal was made and accepted. But the agreement, with its various dividend distributions taking place between 1935 and 1942, must have come to the attention of all the general creditors sooner or later; yet none of them raised any objection to the various distributions or to the agreement during this long period of time. No reason suggests itself why any of these general creditors should now be permitted to question the dividends received in the past by the judgment lien creditors or to demand that the liens be declared forfeited because of the receipt of such dividends. Especially is this so as to Chase National Bank. As the District Court noted, 61 F. Supp. at 152, its counsel recommended and had full knowledge of the agreement; and Chase had knowledge of the subsequent dividend distributions, to which it did not demur. At this late stage, it is equitably estopped from raising any objection to the validity of the liens on the basis of the operation of the plan which it proposed. Cf. *Merchants Bank* v. *Sexton*, 228 U. S. 634; *In re National Public Service Corporation*, 68 F. 2d 859; *In re American S. S. Nav. Co.*, 14 F. Supp. 106.

Moreover, the record does not indicate that any permanent injury to Chase National Bank or to the other general creditors resulted from the operation of the plan. The whole scheme was adopted with the idea that they would be benefited and we cannot say that this purpose has failed

of achievement. Having proposed and acquiesced in the plan, the Chase National Bank cannot now be heard to complain of any resulting injury, especially an injury that is not apparent in the record.

We conclude from these various considerations that the liens should be held to be valid and in existence despite the failure to follow the provisions of § 57 (h) and despite the distribution of dividends contrary to § 65 (a). There was never any intention to waive the security and those who might have objected to the distributions are now estopped. But in view of the fact that the bankruptcy proceedings have been unduly prolonged for over twenty years, the bankruptcy court should now take steps to wind up the estate in accordance with the provisions of the Bankruptcy Act. Those provisions are designed to bring about the speedy distribution of the bankrupt's assets, a distribution of the type which definitely has not occurred in this case.

The judgment of the Circuit Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE FRANKFURTER is of opinion that the order of the District Court should be restored on the ground that the creditors entered into an agreement which was not objectionable under § 57 (h) of the Bankruptcy Act, whereby the liens of the petitioners were saved.

MR. JUSTICE JACKSON concurs in the result.

MR. JUSTICE DOUGLAS dissents.