In the Matter of **ELKINS–DELL MANU-FACTURING COMPANY, Inc.,** Bankrupt.

In the Matter of **DORSET STEEL EQUIP-MENT CO., Inc., Bankrupt.**

Nos. 26109, 26532.

United States District Court
E. D. Pennsylvania.
May 13, 1966.

Wexler, Mulder & Weisman, by M. E. Maurer and Horace A. Stern, Philadelphia, Pa., for trustee.

Jenkins, Bennett & Jenkins, by Bertram Bennett, Philadelphia, Pa., for Fidelity America Financial Corp.

JOSEPH S. LORD, III, District Judge.

These cases involve a narrow but important question of bankruptcy law and administration: May and, if so, should a referee in bankruptcy refuse to enforce a security agreement between a creditor and the bankrupt which the referee finds unconscionable?

## I.

The factual setting of both cases is similar. In Elkins-Dell, the bankrupt and Fidelity America Financial Corporation entered into a loan agreement in October, 1959. Fidelity was to advance money to the bankrupt against an assignment of accounts receivable. In January, 1960, an involuntary bankruptcy petition was filed, and after an unsuccessful attempt at an arrangement, Elkins-Dell was adjudicated a bankrupt in May, 1960.

The agreement was, to say the least, somewhat one-sided. Fidelity was to advance 75% of the value of accounts assigned to it, but was obligated to take only "such Accounts of [Elkins-Dell] which, in the sole and unlimited discretion of [Fidelity], may be acceptable to [Fidelity] and to pay therefor." The bankrupt, on the other hand, promised that it would neither "negotiate for nor borrow any form of money whatsoever from any source other than [Fidelity] without the written consent of [Fidelity] first obtained" and that it would neither "sell or. assign any accounts to any person, firm or corporation other than [Fidelity]; nor sell, dispose of, or in any way, hypothecate any assets, without the written consent of [Fidelity] first obtained." The bankrupt, in other words, had the obligation to finance only through Fidelity, but Fidelity had the power to refuse to supply the bankrupt with funds. This arrangement, the referee concluded, "spelled ruin to the bankrupt * * *." Record, Elkins-Dell, p. 24.

Fidelity also reserved the power to direct the Post Office to deliver all the bankrupt's mail to it, to receive and open such mail and "to dispose of all mail addressed to [the bankrupt]." The bankrupt promised not to "request an exten-sion from or a composition with creditors" or to "file a Voluntary Petition in Bankruptcy, or for an Arrangement or Reorganization or the appointment of a Receiver or make an Assignment for the Benefit of Creditors; without the written consent of [Fidelity] first obtained." Fidelity got the power to veto a suspension of the bankrupt's business, for that, too, required Fidelity's prior "written consent." It had the unilateral power to change the terms of the contract merely by giving notice of the change by certified mail. Such a change could be vetoed by the bankrupt if it expressed its disagreement in writing within five days, and there is no evidence of any attempts to change any of the terms.

The interest rate was $\frac{1}{23}$ of 1% per day (more than 15.8% per year) on the total unpaid balance of any amount loaned, but in any event a minimum of $500. per month, plus $\frac{5}{23}$ of 1% on check collections. The interest rate would have been usurious, except for the Pennsylvania statute which precludes a corporation from raising the defense of usury. 15 P.S. § 2852–313.

Pursuant to the agreement, substantial advances of money were made to the bankrupt, and during October, November and December, 1959, substantial collections were made by Fidelity on the accounts assigned. At the end of December, Fidelity was still owed about $28,-536 (cents omitted throughout). No loans were made thereafter. By the date the involuntary petition was filed, collections on accounts had reduced the balance due to about $14,061. By January 26, 1960, the advances had been paid off, and about $2,082 stood to the credit of the bankrupt. By May 25, 1960, the credit balance was $10,678.

In March, 1961, the trustee demanded an accounting from Fidelity. In April, an accounting was rendered, to which exceptions were filed in June. On June 27, 1961, a special hearing on the exceptions was held. Decision was reserved, and because of delay by the parties, a decision was not rendered by the referee until July 22, 1965. The referee found the

contract unconscionable and ordered Fidelity to pay the costs of the proceedings and to turn over to the estate the money collected on the accounts after the petition was filed; the $5,000 minimum interest fee charged in November, 1959, for the remaining ten months of the agreement; and the difference between the more than 15% annual interest collected from October to December, 1959, and the legal rate of 6%. Of that order Fidelity seeks review.

In Dorset Steel, the contract provisions were essentially the same, except that the interest rate was 1/20 of 1% per month (more than 18.2% per year) and the minimum interest was $250 per month. Dorset was originally a partnership. It incorporated shortly before the agreement was entered into, but the trustee concedes that he has no standing to contest the incorporation or the circumstances surrounding it, or otherwise to raise the defense of usury.[1]

The major difference between the two cases is the manner in which the issue arises. In Dorset Steel, unlike Elkins-Dell, a secured claim was filed by Fidelity against the estate. The cash balance owing to it was $11,423. Finding the contract unconscionable, the referee ordered Fidelity to pay the trustee all interest collected in excess of 6% per annum, plus interest on the amounts so due, as well as the costs of the proceedings. He further disallowed the secured claim of $11,423 but allowed it as an unsecured claim in the same amount. Fidelity duly petitioned for review of that order.

## II.

The referee concluded, to use his language in Elkins-Dell, that each of these agreements "is so one-sided in favor of Fidelity, drives so hard a bargain and is so overreaching as to be unenforceable in a court of conscience." Record, Elkins-Dell, p. 31. He relied largely on Campbell Soup Co. v. Wentz, 172 F.2d 80 (C.A. 3, 1948), which held that equity would not enforce an unconscionable contract. Campbell Soup had succeeded in obtaining an agreement with a carrot grower which included a provision excusing Campbell from accepting carrots under certain circumstances, but did not permit the grower to sell rejected carrots anywhere else. When Campbell sued for specific performance, the court found that "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." 172 F.2d at 84. In the instant contracts, there is a provision comparable to the one which the court found in *Campbell* to be "the hardest." Id. at 83. That is the provision allowing Fidelity to pick and choose what accounts it would accept but precluding the bankrupts from going elsewhere to find funds. There are, in addition, other provisions, outlined above, which the referee found onerous and oppressive.

 In reviewing his orders, we start from the premise that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). That, naturally, is not a panacea. But the equity powers of the bankruptcy court extend not merely to the issuance of orders and the granting of relief "to secure or preserve the fruits and advantages of a judgment or decree rendered therein," id. at 239, 54 S.Ct. at 697, and not just to the rigorous scrutiny that it gives the conduct and dealings of the bankrupt, e. g., Acme Distrib. Co. v. Collins, 247 F.2d 607 (C.A. 9, 1957), but also to the examination it makes of the claims of creditors, Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). For "the bankruptcy court in passing on allowance of claims sits as a court of equity. * *

---

1. He has abandoned any effort to prove that the incorporation was for the sole purpose of avoiding the prohibition of usurious interest. Cf. Gelber v. Kugel's Tavern, 10 N.J. 191, 89 A.2d 654 (1952);

Walnut Discount Co. v. Weiss, 205 Pa. Super. 161, 208 A.2d 26 (1965); Silver v. Michelle Gardens, 32 Pa.Dist. & Co. R.2d 289 (C.P.1963).

In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." Id. at 307–308, 60 S.Ct. at 245.

■■ "One of the primary purposes of the Bankruptcy Act is the equitable distribution of the bankrupt's estate among its creditors." Matter of Laskin, 316 F.2d 70, 72 (C.A. 3, 1963). Since Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), extensive surveillance has been given to the claims of creditors. Equitable powers

"have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. By reason of the express provisions of § 2 [of the Bankruptcy Act] these equitable powers are to be exercised on the allowance of claims, a conclusion which is fortified by § 57, sub. k, 11 U.S.C.A. § 93, sub. k. For certainly if, as provided in the latter section, a claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case,' disallowance or subordination in light of equitable considerations may originally be made." 308 U.S. at 305, 60 S.Ct. at 244.

■■ While it is true that Pepper and most of the cases which have followed it have involved insider transactions with the bankrupt corporation, usually fraud on the part of a dominant stockholder, that factual difference goes mainly to the appropriate remedy. Where, as is often the case, the claim of a dominant stockholder against his undercapitalized corporation is in reality for a capital contribution disguised as a loan or sale, subordination is usually the proper cause. On the other hand, different but equally inequitable conduct might better be handled by disallowance of a claim in whole or in part. It is clear, however, that fraud or insider manipula-

tion is not the only ground for equitable adjustment of a claim. The bankruptcy court has the power "to prevent the consummation of a course of conduct by the claimant which * * * would be fraudulent or *otherwise inequitable.*" Heiser v. Woodruff, 327 U.S. 726, 733, 66 S.Ct. 853, 90 L.Ed. 970 (1946) (emphasis supplied).

That power exists notwithstanding Manufacturers Fin. Co. v. McKey, 294 U.S. 442, 55 S.Ct. 444, 79 L.Ed. 982 (1935). There, an accounts receivable agreement had been entered into for loans on 100% of the net amount of accounts assigned, less charges for interest and compensation for services rendered by the lender. The total charges for the loans would have amounted to about 20% per year on the outstanding balance of cash advanced. The creditor began an action in the federal district court, which appointed receivers. At the district court's direction, the receivers paid the amount due up to the time of their appointment, but in the interval from their appointment to the liquidation, an amount accrued equal to about 28.3% per year, plus large counsel fees. The district court allowed 7% instead, refusing to permit the creditor to recover so exorbitant an amount in an equity court. After bankruptcy intervened, the court of appeals affirmed.

The Supreme Court reversed, holding that as the contract was valid under state law and the creditor had asked for no distinctly equitable relief, the district court was powerless to deny relief on equitable grounds. "The mere fact," wrote Mr. Justice Sutherland for the Court,

"that a party is obliged to go into a federal court of equity to enforce an essentially legal right arising upon a contract valid and unassailable under controlling state law does not authorize that court to modify or ignore the terms of the legal obligation upon the claim, or because the court thinks that these terms are harsh or oppressive or unreasonable. A party may stand upon the terms of a valid contract in a

court of equity as he may in a court of law. 'If he asks no favors, he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity.' " 294 U.S. at 448–449, 55 S.Ct. at 447.

For the reasons which follow, we have concluded that *McKey* does not prevent a bankruptcy court from inquiring into the conscionability of a claim.

A bankruptcy claimant, like Fidelity, which relies on its security, is "asking a favor" of the bankruptcy court. There are several courses open to a secured creditor in bankruptcy. One of them is to surrender or waive the security and prove the claim as unsecured. See United States Nat'l Bank in Johnstown v. Chase Nat'l Bank, 331 U.S. 28, 67 S.Ct. 1041, 91 L.Ed. 1320 (1947). Fidelity has not done that here. What it appears to have done in Elkins-Dell is to rest on its security even to the extent of continuing collections after the petition was filed, a course which requires the approval of the bankruptcy court. In Dorset Steel, Fidelity filed a secured claim. In both it asked for the affirmative aid of the bankruptcy court to secure its preferred position in the bankruptcy. That aid having been invoked, equitable scrutiny attaches.

Furthermore, state law is no longer entirely controlling. "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overriding federal law, is to be determined by reference to state law." Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). But in determining whether a claim is allowable in bankruptcy, the federal courts must "decide whether allowance of the claim is compatible with the policy of the Bank-

ruptcy Act." Id. at 162, 67 S.Ct. at 240. In *McKey* the court gave great weight to the enforceability of the agreement to pay usurious interest under Illinois law. We note that Pennsylvania, too, has held an agreement to pay usurious interest enforceable against a corporation even in equity, Houghten v. Restland Memorial Park, 343 Pa. 625, 23 A.2d 497 (1942), although Pennsylvania has long followed the traditional principle that equity does not enforce unconscionable contracts. See, e. g., Henderson v. Hays, 2 Watts 148, 152 (Pa.Sup.Ct.1834); Friend v. Lamb, 152 Pa. 529, 534, 25 A. 577 (1893); Schaeffer v. Jones, 293 Pa. 529, 535–536, 143 A. 197 (1928). But the validity of the claim under state law would be no bar to disallowing it in bankruptcy because the bankruptcy court must exercise "[the] authority granted by Congress to determine how and what claims shall be allowed under equitable principles." *Vanston,* supra, 329 U.S. at 163, 67 S.Ct. at 240. *McKey* is thus not dispositive of the issues before us.

In *Vanston,* the Supreme Court disallowed a claim for interest upon interest on "the equitable principles governing bankruptcy distributions." Ibid. See also In re Tastyeast, Inc., 126 F.2d 879 (C.A. 3, 1942), cert. denied, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942); Matter of Leeds Homes, Inc., 222 F.Supp. 20, 33–34 (E.D. Tenn.1963), aff'd, 332 F.2d 648 (C.A. 6, 1964), cert. denied, 379 U.S. 836, 85 S.Ct. 71, 13 L.Ed.2d 43 (1964); In re De Moise, 87 F.Supp. 474 (N.D.Ohio 1949), making similar equitable adjustments. Compare Matter of Magnus Harmonica Corp., 262 F.2d 515 (C.A. 3, 1959) (trustee bound by debtor's failure to object to interest upon interest as the contract required). In the context of excessive interest, it has been suggested that "[i]f the course be just, the reorganization court has a free hand to scale down or modify the debt, even though the state court had decided the interest is not usurious." Matter of Terrace Lawn Memorial Gardens, 256 F.2d 398, 402 (C.A. 9, 1958) (dictum). For "the mere

right of a claimant to a judgment at law is not a dictate that a claimant should participate in the dividends in a bankruptcy proceeding where equity would indicate otherwise." Matter of William J. McCarthy, Inc., 125 F.Supp. 416, 418 (S.D. N.Y. 1954) (dictum). See also GLEICK, THE EQUITABLE POWER OF BANKRUPTCY COURTS TO SUBORDINATE CLAIMS OR TO DISALLOW CLAIMS ENTIRELY ON EQUITABLE GROUNDS: A DISCUSSION OF DEVELOPMENTS, 33 Ref.J. 69, 72 (1959). Put differently, "a valid defense cognizable in a court of equity is not lost by the bankruptcy of the defendant and will be duly recognized in bankruptcy." MAC LACHLAN, BANKRUPTCY § 143, at p. 135 (1956). But cf. id., § 184, at p. 194. Compare In re National Mills, 133 F.2d 604, 610 (C.A. 7, 1943), apparently involving excessive interest but decided before Vanston. See generally COLLIER, BANKRUPTCY ¶63.07 (14th ed. 1964).

As a matter of federal law, the Campbell Soup case indicates that unconscionability is a valid defense in equity. 172 F.2d at 81–82. But the McKey case suggests a persuasive reason for exercising this equitable discretion more cautiously in bankruptcy. McKey rests heavily on the exclusiveness of the remedy in the equity court. Proceeding from the premise that "in an action at law against the receivers the court would have been bound to enforce the contract under review strictly in accordance with its terms," the opinion concludes that "the rule is not otherwise where plaintiff * * * is obliged to submit the determination of his strictly legal rights to a chancery court because it has plenary control of the remedy." 294 U.S. at 451, 55 S.Ct. at 448. "Certainly no unconscionable or inequitable conduct can be attributed to petitioner because it undertook to secure the fruits of a perfectly valid, albeit a hard, contract in the only court to which it could apply without being subject to a charge of contempt." Ibid.

Campbell Soup is the converse situation. The court there denied the aid of equity to the plaintiff, thus leaving it to pursue the available remedy at law. Plaintiff, in other words, was left with some place to go. It could vindicate its legal rights in a legal forum. Equity, therefore, could afford the luxury of not specifically enforcing the legal rights without impairing their viability at law.

The bankruptcy court is, of course, the exclusive forum in which Fidelity could press its claim. While some of the provisions of the instant contracts are of dubious validity under Pennsylvania law and public policy, it is not suggested that the essential and operative terms of the contracts, or the contracts as wholes, are invalid. Because of the exclusiveness of the remedy in bankruptcy, it does not follow inexorably that what was soup for Campbell is sauce for Fidelity. Although unconscionability would be a legitimate reason to disallow a claim in a proper case, convincing proof of the inequitable conduct of the claimant is necessary to warrant the exercise of that power.[2]

2. There is a temptation to decide that the exclusiveness of the bankruptcy remedy is an insubstantial justification for enforcing claims such as Fidelity's undiluted by considerations of equity, since the onerousness of its contracts with the bankrupts may have so precluded the bankrupts' access either to other funds at lower rates or more funds than Fidelity was willing to advance that Fidelity may well have been responsible for the bankruptcies or at least for blocking any other way out of the bankrupts' increasing difficulties. That argument, however, we find unappealing, because the inferences it depends upon are wholly unsupported in the record. A finding that Fidelity itself bargained away its choice of remedies by making the bankruptcy more certain—that it is, loosely speaking, estopped from complaining of the scrutiny which equity gives its claims—would have to be predicated on more than speculation about the effect the contracts had on the bankrupts' businesses.

## III.

We turn to a consideration of how the power of the referee to disallow a claim for unconscionability ought to be exercised, and particularly, what standard should be employed to determine whether a contract is so unconscionable as to be unenforceable in bankruptcy.

Unconscionable contracts are a genus, of which there is more than one species. One variety of unconscionable contract is very much like contracts of adhesion (which are becoming increasingly difficult to make stick). It usually involves a party whose circumstances, perhaps his unworldliness or ignorance, when compared with the circumstances of the other party, make his knowing assent to the fine-print terms fictional. Courts have frequently found in these circumstances the absence of a meaningful bargain. See 3 CORBIN, CONTRACTS § 559, at pp. 270–71 (1960). Another species concerns what is basically economic duress. In the absence of a general mandate to review the adequacy of consideration, there has sometimes been a review of the economic positions of the parties and a finding that the position of one was so vulnerable as to make him the victim of a grossly unequal bargain. To be sure, these two types of situations sometimes overlap, but the latter is substantially the case of the bankrupts here. We are not dealing with a fictional assent but a genuine assent by businessmen to terms which, the trustees assert, ought not to be countenanced.

We entertain grave doubts about the wisdom of declining to enforce contracts entered into under these circumstances. It would be unsound to encourage bankruptcy trustees or general creditors to attempt to escape lawful factoring debts by impassioned appeals to equity—unsound because it would be inconsistent with the scheme of the Bankruptcy Act and because it would tend to dry up the credit of businesses which need it most. There are important considerations of policy in favor of promoting the availability of funds for businesses in distress, even at unusually high rates of interest. The risks of lending are sometimes great, and the inducements may have to be commensurate.[3] These are considerations particularly impelling upon the bankruptcy court, which, charged with responsibility for the liquidation of business misfortunes, has a corresponding interest in keeping businesses afloat. It would be a paradoxical course for the bankruptcy court, in the process of protecting bankrupts and unsecured creditors, to adopt a principle which dealt a *coup de grace* to other shaky businesses in need of financing but unable to get it except upon terms unacceptable to the court as it views the transactions *post facto*. It would be an egregious instance of "yielding to pity for the individual case at the cost of a more inclusive rescue * * * ." Freund, MR. JUSTICE BRANDEIS: A CENTENNIAL MEMOIR, 70 Harv.L. Rev. 769, 787 (1957). The bankruptcy court has no desire to force the entrance of more small businesses through its portals.

To hold these contracts unenforceable on their face would probably be to impose a judicially invented but economically dysfunctional morality upon knowledgeable contracting parties. It might jeopardize the availability of receivables financing for those for whom factoring is the only practicable way of securing cap-

---

3. In this connection, it is not amiss to note that the Official Comment to § 2–302 of the Uniform Commercial Code, 12A P.S. § 2–302, states that the "principle [of unconscionability] is one of the prevention of oppression and unfair surprise * * * and not of disturbance of allocation of risks because of superior bargaining power." If the primary purpose of § 2– 302 is the protection of consumers, cf. 79 Harv.L.Rev. 1299, 1300–02 (1966), the quoted extract applies with special force to cases where, as here, there is no contention of "unfair surprise" but of abuse of bargaining power. On the applicability of § 2–302 to non-sales contracts, see note 4, infra.

ital. It would be to add a risk of unenforceability to the other risks inherent in such financing. The invocation of the economic duress species of unconscionability has most often been questioned on the ground that refusal to enforce a contract because of it has deleterious economic consequences. See, e. g., Note, UNCONSCIONABLE BUSINESS CONTRACTS: A DOCTRINE GONE AWRY, 70 Yale L.J. 453 (1961). It is those consequences we wish to avoid.

The argument can be made that this is not just a case of excessive interest rates. Here a factor entered into agreements which by their terms tied the bankrupts to it as their sole source of funds without giving any assurance whatever that the funds would be forthcoming. Even indulging the assumption that the provision giving Fidelity "sole and unlimited discretion" to reject any accounts the bankrupts sought to assign would be construed judicially to allow only the exercise of a reasonable discretion, that would be little solace to the bankrupts in their quest for financial viability. They could not assign their accounts to anyone else anyway, and even if they could despite the express provisions to the contrary, the contract terms made the bankrupts' rights to assign them elsewhere so cloudy and their positions so risky that it is difficult to conceive that any other avenues of credit would be open to them. Far from furthering the policy favoring the prevention of business failures, this argument goes, Fidelity's conduct in these two cases contravened it. There would thus be no substantial economic interest served in allowing it the fruits of these transactions.

We have made this argument at length because it deserves full consideration. We are unable to accept it, however, for two reasons. First, whether or not these agreements had the effect of closing off the bankrupts' other sources of credit, the fact is that at least some factors apparently view this type of contract as a necessary form of protection to insure that they have the opportunity to lend money on accounts that are collectible.

If these provisions are held unenforceable in bankruptcy, which is, after all, where at least some such borrowers end up, lenders are likely to substitute another form of protection, perhaps higher interest or more selective choice of borrowers. It is therefore a dangerous oversimplification to distinguish the interest rates from the other contract terms.

Secondly, that these agreements are in effect more detrimental than helpful to borrowers is an economic judgment which we are not well-equipped to make. This is precisely the kind of problem that the legislature, either federal or state, would be far better able to deal with than the courts. In this connection, the conclusion of the trustee's brief in Dorset Steel is revealing. It argues the desirability of regulation of factors: "While there is an obvious need for financing sources for businessmen who, because of difficulties and poor credit ratings, cannot obtain so-called 'conventional' financing, these sources must be legally controlled so that they will be unable, under the guise of saviors, to be actually the executioners of businesses in trouble." BRIEF FOR TRUSTEE, Dorset Steel, p. 35.

It is not difficult to grant the premise that regulation may be required without conceding the trustee's conclusion that the job is for the bankruptcy court. If the financing industry needs regulation, the legislature is in a better position to know. It is able to institute a wide-ranging investigation to study the problem as a whole, to secure economic information unencumbered by the limitations of the judicial process, and to avoid the dangers of piecemeal regulation. It is able to draw lines that courts are unable to draw at all or at least in advance. The instant cases call attention to a significant and probably recurring problem, but its very breadth suggests that the trustees' appeal should be addressed to the legislative forum. It would be ill-advised for a court to proscribe these contracts outright.

In Bushwick-Decatur Motors v. Ford Motor Co., 116 F.2d 675 (C.A. 2, 1940),

the court of appeals was faced with a comparable problem: whether to read an automobile dealership contract containing an "unmistakably expressed" power of termination at the will of the manufacturer so as to allow only a reasonable, good-faith discretion to terminate. This the court (through Judge Clark) declined to do:

"Such a limitation can be read into the agreement only as an overriding requirement of public policy. This seems an extreme step for judges to take. The onerous nature of the contract for the successful dealer and the hardship which cancellation may bring him have caused some writers to advocate it, however; and an occasional case has seized upon elements of overreaching to come to such a result on particular facts. * * * But, generally speaking, the situation arises from the strong bargaining position which economic factors give the great automobile manufacturing companies: the dealers are not misled or imposed upon, but accept as nonetheless advantageous an agreement in form bilateral, in fact one-sided. To attempt to redress this balance by judicial action without legislative authority appears to us a doubtful policy. We have not proper facilities to weigh economic factors, nor have we before us a showing of the supposed needs which may lead the manufacturers to require these seemingly harsh bargains." 116 F.2d at 677.

## IV.

We are left, then, on the one hand, with the mandate to screen claims for inequitable conduct, the harsh terms of these contracts, and the "fundamental purpose of the Bankruptcy Act * * * to secure an equitable distribution of the bankrupt's assets among his unsecured creditors," 4 COLLIER, BANKRUPTCY ¶67.12[5], p. 129 (14th ed. 1964), and, on the other, with the economic dubiousness and institutional difficulty inherent in judicially refusing to enforce the otherwise valid agreements. Certainly, the present records are singularly inadequate to enable a court to decide so perplexing an issue. As evidence on the issue of unconscionability, they contain only the contracts themselves. The contracts appear to be the products of dealings by a lender with borrowers in acute financial distress. But the contracts cannot tell us whether those dealings resulted in imposition on the bankrupts or merely justified precautions on the part of the factor. Given the interest in commercial certainty, the exclusiveness of the creditor's equitable remedy in bankruptcy, and the knowledgeability of the borrower where economic duress is the basis of the asserted unconscionability, to prove unconscionability there must be a showing, not only that the terms of the contract are onerous, oppressive, or one-sided, but also that the terms bear no reasonable relation to the business risks. This is a showing that depends on the commercial environment and cannot be made from the face of a contract alone.

We think, therefore, that the referee acted precipitously in refusing to enforce these contracts. He viewed the question solely as a matter of law, to be judged from "the terms of the contract, which speaks for itself." Record, Elkins-Dell, p. 83. See Record, Dorset Steel, p. 221. In that view, he was in error. Even in the context of an unconscionable sales contract, which the Uniform Commercial Code permits the courts to refuse to enforce in whole or in part, 12A P.S. § 2–302(1), the parties are "afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." 4 12A P.S. § 2–302(2). See also Williams v. Walker-

---

4. We do not accept the invitation of the trustees to hold § 2–302 applicable to agreements other than sales contracts. Cf. Note, 45 Va.L.Rev. 483 (1959). In view of the disposition we make of these cases, it is unnecessary to reach that question.

Thomas Furn. Co., 350 F.2d 445 (C.A. D.C.1965). The commercial context would be at least as relevant in these cases, where the varying risks make the objective ascertainment of the value of the consideration exchanged a seemingly more hazardous task.

## V.

We therefore find it incumbent to prolong the termination of this lengthy litigation still further by remanding these cases to the referee for prompt and thorough factual hearings on unconscionability. Cf. Matter of Komfo Products Corp., 247 F.Supp. 229, 240 (E.D.Pa. 1965). The ultimate question for the referee will be whether these contracts were, in the light of all the circumstances, reasonable commercial devices. Among the issues which may be explored at these hearings, and which may enter into the determination, are the financial positions of the bankrupts at the time the agreements were entered into; the extent to which agreements of this kind are customary among lenders like Fidelity; the extent to which Fidelity's contracts vary with and reflect anticipated risks; the availability of other credit to the bankrupts, both at the time and after they entered into these agreements; the extent to which the various provisions were enforced by Fidelity or influenced the bankrupts' business conduct, particularly their ability to secure other funds; whether the terms of these contracts facilitated commerce by making funds available where they otherwise would not be or impeded commerce by precluding access to other sources of funds; and the effects of holding these contracts unenforceable in bankruptcy on the future financing of similar businesses in need of funds.

The need for such a hearing in these cases is underscored by the action the referee took after finding the contracts unconscionable. In Dorset Steel, Fidelity's secured claim for $11,423 was al-

lowed as an unsecured claim. Fidelity was ordered to pay the trustee all money collected from the assigned accounts after the date the petition was filed, plus all interest and charges in excess of 6% collected before the petition was filed and interest on the amounts found to be due. In Elkins-Dell, the referee required Fidelity to turn over to the trustee $24,811, which represents the total collections on accounts made after the petition was filed, less a credit for the $10,678 which Fidelity paid the trustee on March 29, 1961, plus interest on the $10,678 from the date the petition was filed to the date that amount was paid, and on the remaining $14,132 from the date of the petition to the date that amount is finally paid. The referee also ordered Fidelity to return to the trustee the sum of $5,000 improperly charged as accelerated interest, plus interest thereon from the date the petition was filed to the date of reimbursement; $1,353, which represents interest in excess of 6%; and $263 in unexplained charges. Presumably, although it is not explicit in the order, the referee intended to allow Fidelity an unsecured claim for the $14,061 still owed it on the date the petition was filed, the collection of which amount Fidelity has been compelled to disgorge. See Record, Elkins-Dell, p. 26.

If a creditor relies on security "tainted with fraud * * * tainted as a preference or other voidable transfer," he may nevertheless "normally be allowed to prove his claim as unsecured." 3 COLLIER, BANKRUPTCY ¶57.20[4], at pp. 302–03 (14th ed. 1964) ; see also id., ¶57.-07, at p. 160; Barks v. Kleyne, 15 F.2d 153 (C.A. 8, 1926). The taint of unconscionability is similar to these. If, therefore, the contracts were unconscionable, the compelled turn-over of the collections from the security in Elkins-Dell, the disallowance of the secured claim in Dorset Steel, and the substitution of Fidelity as an unsecured creditor in both would have

been proper.[5] Similarly, inasmuch as claims arising from quasi-contractual obligations are provable in bankruptcy, Brown v. O'Keefe, 300 U.S. 598, 606, 57 S.Ct. 543, 81 L.Ed. 827 (1937); In re Kellett Aircraft Corp., 77 F.Supp. 959, 964 (E.D.Pa.1948), aff'd, 173 F.2d 689 (C.A. 3, 1948), once the referee had refused to enforce the contracts it would also have been entirely appropriate, in achieving "a balance of equities between creditor and creditor," Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946), to scale Fidelity's claims for interest down to a reasonable rate to prevent it from profiting at the expense of others from its unconscionable contracts. But a reasonable rate would not necessarily have been 6%. The reasonableness of a return would depend upon the custom, the risks, the setting—in other words, on the very same elements that would govern whether the contracts were conscionable to begin with, and neither a judgment on conscionability nor on a reasonable rate of return could have been made from the face of the contracts without a hearing.

After full consideration, the referee will be able to make new findings of fact and conclusions of law on unconscionability and, regardless of his determinations on that issue, also on the question of whether the financing agreement in Dorset Steel was an executory contract which was rejected by the trustee's alleged failure to take any action to assume or reject it; because of the referee's disposition of Dorset Steel on unconscionability grounds, no findings or conclusions have yet been made on the latter issue. The referee may then enter appropriate orders.

The orders of the referee will be vacated and the cases remanded to the referee for further proceedings not inconsistent with this opinion. It is so ordered.

5. As opposed, for example, to subordination, which, as indicated above, has been utilized mainly to redress under-capitalization and similar corporate misdealing.

See, e. g., Costello v. Fazio, 256 F.2d 903 (C.A.9, 1958); compare In re Kansas City Journal-Post Co., 144 F.2d 791 (C.A. 8, 1944).