In re METAL–BUILT PRODUCTS, INC., Debtor.

Leon BORNSTEIN, Plaintiff,

v.

METAL–BUILT PRODUCTS, INC., Defendant.

Bankruptcy No. 79–877EG.

United States Bankruptcy Court,
E. D. Pennsylvania.

March 5, 1980.

Samuel M. Brodsky, Philadelphia, Pa., for plaintiff.

Lester H. Novack, Cohen & Novack, Philadelphia, Pa., for debtor/defendant.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue before the court is whether the plaintiff, Leon Bornstein ("Bornstein"), is entitled to reclaim the machinery and equipment of the defendant corporation, Metal-Built Products, Inc. ("the debtor"), pursuant to a security and loan agreement executed by the parties on September 12, 1977. While we conclude that Bornstein's security interest is valid and perfected under Article 9 of the Uniform Commercial Code, because we also find that there is equity in the machinery and equipment and because the secured property is necessary to a consummation of the debtor's proposed plan, the complaint seeking reclamation will be denied.

This case first came before us on May 16, 1979, when the debtor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., and became a debtor in possession. The debtor listed Bornstein in its schedules as a secured creditor to whom was due a debt of approximately $19,000. On October 5, 1979, Bornstein filed a complaint in reclamation. Following the filing of an answer and a motion to dismiss, a trial was held at which the testimony was as follows: [1]

The debtor, a Pennsylvania corporation, is a subcontract manufacturer of sheet metal products. It also fabricates ovens which are sold through Pretzelite Oven Corporation. Charles W. King ("King") is the president and sole stockholder of the debtor, Pretzelite Oven Corporation and Twisteroo Soft Pretzel Company ("Twisteroo").

At the time the loan in question was made, Bornstein was the president and a major stockholder of a company known as American Pacific Investment Corporation ("American") which is in the business, *inter alia*, of making corporate and consumer loans.

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

In September, 1977, King, on behalf of the debtor, approached American for a business loan but was told that, because of a previous loan made in August of 1977 to Twisteroo, an additional loan through American could not be granted. Bornstein, however, offered to make a personal loan of $20,000 to the debtor.

On or about September 12, 1977, Bornstein and the debtor entered into a security and loan agreement wherein the debtor agreed to borrow from Bornstein the sum of $20,000 in consideration of which the debtor agreed to repay Bornstein the sum of $42,560 within a period of twelve months in installments of $405 per week ($21,060) with a final lump sum payment of the balance, namely $21,500. The repayment figure entailed an annual interest rate in excess of 100%. Both Twisteroo and King, individually, gave notes guaranteeing the loan. Financing statements were duly executed by the parties and Bornstein, and were filed respectively in the appropriate county and state offices.

At the time of the loan, the debtor delivered to Bornstein 52 post-dated weekly checks, each in the amount of $405, and all of which were paid either as drawn or by money orders or cashier's checks. When the balance of the loan became due, the debtor was unable to pay it but continued to make the weekly payments to Bornstein. At the time of the filing of the petition for arrangement the debtor had paid Bornstein a total of $30,755.

In seeking to have Bornstein's security interest in the debtor's equipment and machinery set aside by this court, the debtor contends (a) that satisfaction by payment of the loan has been made since the total sum of $30,755 paid by debtor on the original $20,000 loan constitutes a repayment of the principal of the loan in full together with interest and add-on charges at an excessive interest rate; (b) that Bornstein knew or should have known at the time he made the

loan that the debtor was in financial difficulty; and (c) that Bornstein in contracting for an interest rate in excess of 100% per annum on the principal, in addition to imposing a lien on all the machinery and equipment of the debtor, as well as requiring others to guarantee the loan, made a contract which was legally unconscionable.

The debtor also argues that continued possession of the machinery and equipment is indispensable to the operation of its business and essential to the consummation of its plan with its unsecured creditors.

While Bornstein concedes that the contract between him and the debtor is, on its face, usurious,[2] he argues that a corporation organized and existing under the laws of the Commonwealth of Pennsylvania cannot raise the defense of usury. Business Corporation Law, Act of May 5, 1933, Amended 1978, 15 P.S.A. § 1313. That law provides as follows:

> No business corporation shall plead or set up usury, or the taking of more than six percent interest, as a defense to any action brought against it to recover damages on, or to enforce payment of, or to enforce any other remedy on, any mortgage, bond, note, or other obligation executed or effected by the corporation.

As we noted in *In the Matter of Beech Street Holding Corporation*, Cause No. 71–17 (1971), "Since the debtor was a corporate borrower, it seems clear that it cannot avail itself of the defense of usury." Accord: *In re Tastyeast, Inc.*, 126 F.2d 879 (3d Cir. 1942); *Houghton v. Restland Memorial Park*, 343 Pa. 625, 23 A.2d 497 (1942).[3]

However, the debtor contends that it has not only satisfied the debt owed to Bornstein but, that the contract itself is unconscionable, and therefore unenforceable. It directs the court to *In re Elkins Dell Manufacturing Co., Inc.*, 253 F.Supp. 864 (E.D.Pa. 1966), which held that the bankruptcy court

---

**2.** Plaintiff's Findings of Fact and Conclusions of Law, p. 4.

**3.** In *Houghton* the Supreme Court of Pennsylvania allowed as a claim in a state receivership

proceeding a $20,000 "bonus" note, given along with another note for $20,000, in return for a loan of $20,000, holding the contract "valid and unassailable under state law."

may inquire into the conscionability of a claim because equitable scrutiny attaches where a creditor invokes the aid of the bankruptcy court to secure its preferred position in bankruptcy. In *Elkins Dell* the district court considered two cases involving valid and perfected security agreements, the terms of which the bankruptcy referee had held were so overreaching, onerous and unconscionable as to be unenforceable under the Uniform Commercial Code and cognate law, citing *Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3d Cir. 1948). *Campbell* held that equity would not enforce an unconscionable contract. Campbell Soup Company had obtained an agreement with a carrot grower which included a provision that allowed Campbell to reject carrots under certain conditions but which did not permit the grower to sell his carrots anywhere else. When Campbell sued for specific performance the court decided that "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." 172 F.2d at 84.

The contracts considered by the court in *Elkins Dell* had similar provisions to the one which the court found in *Campbell* to be "the hardest". The contracts allowed the lender to pick and choose what accounts receivable he would accept but precluded the bankrupts from going elsewhere for funds. The contract between the instant debtor and Bornstein contains no such provisions.

In deciding in *Elkins Dell* that a bankruptcy court does have the power to inquire into the conscionability of a claim Judge (now Chief Judge) Joseph S. Lord, III, set up strict standards that must be followed in making such an inquiry. As the court explained, such scrutiny is necessary in trying to effect a balance between the court's mandate to screen claims for inequitable conduct so as to pursue the "fundamental purpose of the Bankruptcy Act" [to secure equitable distribution of the bankrupt's assets among his unsecured creditors, 4 Collier on Bankruptcy ¶ 67.12[5] 4th Ed. 1964] and "the economic dubiousness and institutional difficulty" inherent in a judicial policy of refusing to enforce otherwise valid agreements. Judge Lord determined that:

> . . . [g]iven the interest in commercial certainty, the exclusiveness of the creditors equitable remedy in bankruptcy, and the knowledgeability of the borrower where economic duress is the basis of the asserted unconscionability, to prove unconscionability there must be a showing, not only that the terms of the contract are onerous, oppressive or one-sided, but also that the terms bear no reasonable relation to the business risks. This is a showing that depends on the commercial environment and *cannot* be made from the face of the contract alone.

253 F.Supp. at 873.

The ultimate question to be decided then is whether the contract is, in light of all the circumstances, a reasonable commercial device. The factual determinations to be made by the court in each case are: the financial position of the debtor at the time of entering the agreement; the extent to which the contract varies with and reflects anticipated risks, the availability of other credit to the debtor at the time of and after entering into the agreement; the extent to which various provisions were forced on the debtor or influenced the debtor's conduct (including the ability to secure other funds); whether the terms of the contract facilitated or impeded commerce in making funds available to the debtor, and the effect of holding a contract unenforceable on future financing of similar businesses in need of funds.

In applying the above considerations to the case *sub judice* we cannot make a finding from the testimony that the contract between Bornstein and the debtor is unconscionable. Although in our estimation the rate of interest charged by Bornstein was draconian, King testified that he was well aware when he signed the agreement that the interest rate was at least 100% and that the debtor would be obligated by the contract to pay the amount set

forth therein.[4] King did not indicate in his testimony that he was under any pressure to take out the loan with Bornstein nor did he establish that funding was not available elsewhere. It appears that King has had previous dealings with Bornstein, through American, involving his other corporations and that he was on familiar terms with Bornstein.[5] It can be inferred from the circumstances that Bornstein knew or should have known that the debtor was in financial difficulty at the time of making the loan. But even if this inference were proven in testimony, which it was not, it was not shown that Bornstein used this knowledge to exert any undue influence on King to accept the loan. Rather, all testimony indicates that King entered into the agreement with Bornstein knowingly and willingly despite the excessive interest rate.

The security provisions in the aforesaid agreement did not tie King's hands as far as seeking out other sources of funding. It is not unusual in such agreements for a lender to require a corporate borrower to give a security interest in debtor's property as well as requiring other guarantors on the loan. Such requirements are acceptable modes of corporate financing and facilitate the availability of funding to many marginal businesses. The debtor's allegation of unconscionability of contract is based almost solely on the onerous and oppressive rate of interest charged and, according to the holding in *Elkins Dell*, this is not enough. As the court there states:

> There are important considerations of policy in favor of promoting the availability of funds for businesses in distress, even at unusually high rates of interest. The risks of lending are sometimes great, and the inducements may have to be commensurate. These are considerations particularly impelling upon the bankruptcy court, which, charged with responsibility for the liquidation of business misfortunes, has a corresponding interest in keeping businesses afloat. It would be a

paradoxical course for the bankruptcy court, in the process of protecting bankrupts and unsecured creditors, to adopt a principle which dealt a *coup de grace* to other shaky businesses in need of financing but unable to get it except upon terms unacceptable to the court as it views the transactions *post facto*. It would be an egregious instance of "yielding to pity for the individual case at the cost of a more inclusive rescue * * ". Freund, Mr. Justice Brandeis: A Centennial Memoir, 70 Harv.L.Rev. 769, 787 (1957).

253 F.Supp. at 871.

The debtor also cites Section 2–302(1) of the Uniform Commercial Code, Pa.Stat. Ann. Tit. 12A, § 2–302(1) (Purdon), which permits the courts in certain circumstances to refuse to enforce in whole or in part unconscionable sales contracts. However, this statute is not controlling in the present case. The court in *Elkins Dell* refused the invitation of the trustees to hold § 2–302 applicable to agreements other than sales contracts and this decision was reinforced by the holding of *In re Advance Printing and Litho Co.*, 277 F.Supp. 101 (W.D.Pa. 1967). There the district court held and the Court of Appeals for the Third Circuit affirmed *per curiam*, 387 F.2d 952, that security transactions are beyond the scope of § 2–302 of the U.C.C. The court reversed the decision of the bankruptcy referee to reform the corporate bankrupt's contract with a secured creditor so that the latter would receive $6,000 less from the receiver's sale of its collateral than the amount due it under the perfected security agreement. Therefore, § 2–302 does not assist the debtor in its effort to set aside its contract with Bornstein.

Also cited by the debtor are two U.C.C. cases involving unconscionable claims; but both are clearly distinguishable from the case at bar.[6] Neither of the cited cases involved corporate debtors and, in the *Jack-*

---

4. N.T. pp. 61, 62.

5. N.T. pp. 38, 61.

6. *In re Johnson*, 13 U.C.C.Rep.Serv. 953 (D.Neb.1973). *In re Jackson*, 9 U.C.C.Rep. Serv. 1152 (W.D.Mo.1971).

*son* case, the court, although dealing with an Article 9 security interest, held that a purchase money security interest did not apply to after-acquired purchases, thus taking the contract out of Article 9 before finding it unconscionable.

Based on prevailing law, we hold that the terms of the contract between the debtor and Bornstein are not unconscionable and that therefore Bornstein's security interest in the secured property is valid and enforceable.

■ Contemporaneously with the filing of the petition for an arrangement under Chapter XI the automatic stay of rule 11–44(a) of the Rules of Bankruptcy Procedure took effect.[7] Implicit in the reclamation petition is the request to be relieved of the automatic stay. *In re Garcia,* 396 F.Supp. 518 (C.D.Cal.1974).

In a recent case, *Main Line Federal Savings and Loan Association v. Tri-Kell, Inc.,* Bankruptcy No. 78–58 (1978), we applied Rule 11–44 in a similar situation. There we held that the automatic stay should continue where it was necessary to facilitate the primary purpose of the arrangement proceedings and where it did not cause substantial injury to the secured party. It is incumbent on the debtor, however, to show that he is entitled to a continuation of the stay.[8]

■ King testifying for the debtor, testified that the present value of the encumbered property is between $35,000 and $40,-000.[9] The amount due and owing to Bornstein under the security agreement has been set at $19,060. It is obvious that the debtor has significant equity in the secured property. The use of the machinery and equipment in debtor's business will not impair the value of Bornstein's security interest. The debtor's evidence shows (and Bornstein does not deny) that the secured property is indispensable to its continued operation and to the feasibility of its plan with its unsecured creditors. Therefore, there appear to be urgent equitable reasons why the debtor should not be forced to give up the secured property at this time. The conditions here are similar to those in *In re Atlantic Steel Products Corp.,* 31 F.Supp. 408 (E.D.N.Y.1939) where it was held that the bankruptcy court did not abuse its discretion when it granted a stay on a creditor's right to reclaim secured property. In commenting on the referee's decision, the court observed:

> Clearly, in the case at bar, the equities favor the Debtor, because the value of the property is much greater than the amount of the chattel mortgage, therefore, the petitioner [the secured creditor] was not injured by the stay, whereas, had the Referee granted the petitioner's motion for leave to foreclose, it would have rendered impossible the carrying out of the plan . . .

*Id.* at 410.

The debtor has submitted a plan which is under consideration by its unsecured creditors and the probability of its acceptance appears good. Accordingly, in the present posture of this case we will deny reclamation.

## ORDER

AND NOW, to wit, this 5th day of March, 1980, after trial, it is

---

**7.** Rule 11–44(a): Stay of Actions and Lien Enforcement.

A petition filed under Rule 11–6 or 11–7 shall operate as a stay of the commencement or the continuation of any court or other proceeding against the debtor, or the enforcement of any judgment against him, or of any act or the commencement or continuation of any court proceeding . . ., except a case pending under Chapter 10 of the title, for the purpose of the rehabilitation of the debtor or the liquidation of his estate.

**8.** Rule 11–44(d) states in part:

A party seeking continuation of a stay against lien enforcement shall show that he is entitled thereto.

**9.** N. T. pp. 63 64.

ORDERED that the complaint of Bornstein for reclamation of the machinery and equipment of the debtor is DENIED, without prejudice to the right of Bornstein to reinstate his complaint in the event the debtor is adjudicated a bankrupt.